**EXHIBIT B**

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT is entered into and dated as of June 26, 2007 (this "Agreement"), by and among Tweeter Newco, LLC, a Delaware limited liability company (the "Purchaser"), Tweeter Home Entertainment Group, Inc., a Delaware corporation (the "Company"), and each of the Company's direct and indirect subsidiaries listed on the signature page hereto (individually, a "Subsidiary" and, together with the Company, each a "Seller" and, collectively, the "Sellers").

### W I T N E S S E T H:

WHEREAS, Sellers are engaged in the specialty consumer electronics retail business (the "Business");

WHEREAS, upon the execution of this Agreement, each of the Sellers has filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on June 11, 2007, and each such Seller has requested that the Sellers' respective Chapter 11 cases be jointly administered for procedural purposes under a single Case Number (the "Bankruptcy Case");

WHEREAS, upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, Purchaser desires to purchase from the Sellers, and the Sellers desire to sell to Purchaser, all of the Sellers' assets (other than the Excluded Assets (as defined below)) in exchange for the payment to the Sellers of the Purchase Price (as defined below) and the assumption by the Purchaser of certain of the Sellers' liabilities and obligations;

WHEREAS, the Sellers believe, following consultation with their financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of their assets is necessary to maximize value and is in the best interest of the Sellers, their respective shareholders and creditors; and

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Sellers and the Purchaser entered into an Asset Purchase Agreement, dated as of June 26, 2007, (the "Original Purchase Agreement"), pursuant to which the Sellers agreed to sell to the Purchaser, and the Purchaser agreed to buy from the Sellers, certain of the Sellers' assets pursuant to the terms thereof; and

WHEREAS, the Sellers and the Purchaser wish to amend and restate the Original Purchase Agreement to provide for the sale by the Sellers and the purchase by the Purchaser of the certain assets pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereto hereby agree that the Original Purchase Agreement is hereby superseded in all respects and amended and restated to read in its entirety as set forth herein:

## ARTICLE I

## DEFINITIONS

1.1     Certain Definitions. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 or in other Sections of this Agreement, as identified in the chart in Section 1.2:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Approved Budget" has the meaning set forth in the DIP Credit Agreements.

"Assumed Executory Contracts" means all Assumed Contracts and Assumed Leases.

"Assumption Order" means an Order of the Bankruptcy Court authorizing the assumption or the assumption and assignment of a Contract or Lease pursuant to Section 365 of the Bankruptcy Code, which Order may be the Sale Order.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized by law to close.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Bankruptcy Case.

"Contract" means any contract, indenture, note, bond, lease, license, purchase or sale order, warranties, commitments, or other written or oral agreement, other than a Lease, in each case that is related to the Business.

2

"Cost Value" shall mean, with respect to each item of Purchased Inventory, the standard cost (determined in accordance with past practices and consistent with the DIP Credit Agreements) for such item of Purchased Inventory as properly reflected in Sellers' master cost file as of the Closing Date (the "Cost File").

"Cure Costs" means monetary amounts that must be paid and nonmonetary obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Leases and the Assumed Contracts.

"Cure Costs Cap" means amount equal to Eight Million Four Hundred Thousand Dollars ($8,400,000) minus the Set Off Amount.

"Customer Order" means a partially or completely unfulfilled order by a customer or potential customer of a Seller with respect to which the customer has submitted a deposit.

"Defective Inventory" means any item of merchandise not salable in the ordinary course because it is dented, worn, scratched, broken, faded, torn, mismatched, or merchandise affected by other similar defects rendering it not first quality, that is sold to the Purchaser on the Closing Date.

"Designation Deadline" means: (i) with respect to any unexpired lease of nonresidential real property, twenty one (21) calendar days prior to the Sellers' deadline under Bankruptcy Code Section 365(d)(4)(A) to assume such lease, as such deadline may be extended by the Bankruptcy Court under Bankruptcy Code Section 365(d)(4)(B); and (ii) with respect to all other Contracts, twenty one (21) calendar days prior to the Sellers' deadline under Bankruptcy Code Section 365(d)(2) to assume such Contract.

"Designation Rights" means the Contract and Lease Designation Rights as described in Section 2.5 hereof.

"DIP Credit Agreements" means the debtor in possession financing facilities approved by the Bankruptcy Court.

"Distribution Center" means any of the warehouses or distribution centers listed on Schedule 1.1(a) hereto.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Purchased Assets or used or held for use in connection with the Business in each case whether or not in electronic form.

"Effective Date" means June 26, 2007.

3

"Employee Benefit Plans" means each deferred compensation and each bonus or other incentive compensation, stock purchase, stock option and other equity compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, termination, change in control, retention or severance plan, agreement or arrangement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by the Company, the Sellers or an ERISA Affiliate, that together with the Company would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which the Company, the Sellers or an ERISA Affiliate is party, whether written or oral, for the benefit of any employee or former employee of the Company or any former Subsidiary of the Company.

"Employees" means all individuals, as of the date hereof, who are employed by any of the Sellers.

"Encumbrances" means any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, transfer restriction, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral.

"Environmental Laws" means all federal, state and local laws, regulations, rules and ordinances, and common law, relating to pollution or protection of human health, safety, or the environment from pollution, including, without limitation, laws relating to releases or threatened releases of Hazardous Substances into the environment (including, without limitation, ambient air, surface water, groundwater, land, surface and subsurface strata).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that with the subject Person is:

(a)     a member of a controlled group of corporations within the meaning of Section 414(b) of the Code.

(b)     a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code;

(c)     a member of an affiliated service group within the meaning of Section 414(m) of the Code; or

(d)     a member of a group of organizations required to be aggregated under Section 414(o) of the Code.

4

"Excluded Contract" means any Contract that is not an Assumed Contract.

"Excluded Environmental Liabilities" means any Liability, whenever arising or occurring, whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any disclosure schedule hereto, arising under Environmental Laws with respect to (i) the Excluded Assets, (ii) any assets other than the Purchased Assets and the Excluded Assets owned, leased, operated or occupied by the Sellers at any time, or (iii) the Business, the Purchased Assets or the Real Property (including without limitation any arising from the on-site or off-site release, threatened release, treatment, storage, disposal, or arrangement for disposal of Hazardous Substances) with respect to Liabilities that occurred or existed prior to the Closing Date, except in each case to the extent such Liability is an Assumed Liability pursuant to Section 2.3(a) hereof.

"Excluded Executory Contract" means any Excluded Contract or Excluded Lease.

"Excluded Lease" means any Lease that is not an Assumed Lease.

"Excluded Location" means a Location that is not an Acquired Location.

"Excluded Matter" means: (i) any material change in the United States or foreign economies or financial markets in general; (ii) any material change that generally affects the industry in which Sellers operate; (iii) any material change arising in connection with acts of God, hostilities, acts of war, sabotage, terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) any change in applicable Laws or GAAP or interpretation thereof; or (v) any actions taken or proposed to be taken by Purchaser or any of its Affiliates or with Purchaser's consent or permission; (vi) any actions required by law; (vii) any change resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Transactions, including by reason of the identity of the Purchaser or communication by the Purchaser of its plans or intentions regarding the operation of the Business; or (viii) any material adverse effect resulting from Sellers' lack of liquidity at any time since March 31, 2007 or the filing of the Bankruptcy Case.

"Executory Contract" means any Contract or Lease that is executory as that term is used in Section 365 of the Bankruptcy Code.

"Final Order" means an Order of the Bankruptcy Court the operation which has not been modified or amended without the consent of Purchaser, reversed or stayed, as to which Order no appeal or motion, application, petition or writ seeking reversal, reconsideration, reargument, rehearing, certiorari, amendment, modification, a stay or similar relief is pending, and the time to file any such appeal or motion, application, petition or writ has expired.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by any of the Sellers in the conduct of the Business, including all such artwork, desks, chairs, tables,

5

Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the specified period.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Substances" means any chemical, mixture, waste, substance, material, pollutant, or contaminant, including without limitation petroleum, asbestos and asbestos-containing materials, with respect to which liability or standards of conduct are imposed under any Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property" means all intellectual property arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights, and (iv) all Software of Sellers.

"Interest" shall mean an "interest in property" as such phrase is used in Section 363(f) of the Bankruptcy Code.

"Inventory" shall mean (i) all finished goods inventory that is owned by Sellers for resale at retail and located at any Location as of the Closing Date, including, On Order Inventory and Inventory subject to Gross Rings. Notwithstanding the foregoing, "Inventory" shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Sellers; (2) goods held by Sellers on memo, on consignment, or as bailee; (3) furnishings, trade fixtures, equipment and improvements to real property which are located in any Location; (4) any goods, inventory or products generally given away free with purchase; (5) installation parts/supplies and kits; (6) cell phones and cell phone accessories; (7) build to order merchandise; (8) RTV/to be repaired merchandise; (9) merchandise subject to Manufacturer's recall; and (10) Defective Inventory.

"Knowledge of Sellers" means the actual knowledge of those individuals listed on Schedule 1.1(k) attached hereto.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

6

"Leases" means all unexpired and previously unterminated leases, subleases, licenses or other agreements, including all amendments, extensions, renewals, guaranties or other agreements with respect thereto, pursuant to which the Sellers hold or use any Leased Real Property.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or not accrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any charge against or interest in property to secure payment of a debt (as such term is defined in Section 101(12) of the Bankruptcy Code) or performance of an obligation.

"Location" means the Stores, Office, Distribution Centers or other places at which the Sellers operate the Business.

"Material Decision" means any of the following to the extent the same may affect the Business following the Closing Date: (i) entering into any Material Contract; (ii) terminating any Lease or Contract; (iii) making any material amendment or waiving any of Seller's rights in respect of any Lease or Contract; or (iv) taking any action to respond to any material customer or regulatory complaint outside of the normal course of business.

"Material Adverse Change" means any event, occurrence or effect (regardless of whether such event, occurrence or effect constitutes a breach of any representation, warranty or covenant of Sellers hereunder) that has had or would be reasonably likely to have, individually or when considered together with any other events, occurrences or effects (i) a material adverse change in the Business, financial condition or assets of the Company and its Subsidiaries taken as a whole or (ii) a material adverse change in or to the ability of Sellers to consummate the Transactions or perform their obligations under this Agreement, other than, in either case, to the extent such effect or change results from or relates to an Excluded Matter; provided, however, that the act of filing a case under chapter 11 of the Bankruptcy Code by the Sellers or any subsidiaries does not and shall not constitute a Material Adverse Change.

"Non-Debtor Subsidiaries" means all of the Company's direct and indirect subsidiaries that are not Sellers, including for this purpose the Sellers' equity interest in Tivoli.

"Office" means the office space located at 40 Pequot Way, Canton, Massachusetts 02021.

"On Order Inventory" means first-quality goods for resale at retail (A) to be received at the Locations in the ordinary course from Sellers' vendors on or before the Location Receipt Date, (B) which are consistent as to type, quality and mix as presently located at the Stores, and (C) which are ticketed at Sellers' expense and in accordance with Sellers' historic ticketing practices upon delivery to the Stores.

7

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Permitted Exceptions" means, with respect to any of the property or assets of the Sellers, whether owned as of the date hereof or hereafter, (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record of such property or asset and which would not individually (or in the aggregate with others) be reasonably expected to have a Material Adverse Change on the use or enjoyment of such asset; (ii) any other imperfections in title, charges, easements, restrictions and encumbrances that do not materially affect the value or use of the affected asset; (iii) any statutory liens for Taxes, assessments or other governmental charges; (iv) mechanics', carriers', workers', repairers' and similar Liens; (v) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; and (vii) Liens that constitute Assumed Liabilities.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Petition Date" means the date on which each of the Sellers filed their respective petitions for relief under Chapter 11 of the Bankruptcy Code.

"Sale Order" means an order entered by the Bankruptcy Court in substantially the form annexed hereto as Exhibit A, which attached form is acceptable to the Purchaser.

"Software" means any and all (i) custom computer programs, including any and all custom software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise that are specific to the Sellers, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (iv) custom screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"Store" means any of the stores listed on Schedule 1.1(b).

"Tax Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code, or by contract,

8

indemnity or otherwise, and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Tivoli" means Tivoli Audio, LLC, a Delaware limited liability company.

"Transition Services Agreement" means an agreement that is substantially in the form attached hereto as Exhibit B to this Agreement.

1.2     Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Acquired Location | 2.1(b)(ii) |
| Agreement | Preamble |
| Allocation Statement | 11.2 |
| Antitrust Division | 8.4(a) |
| Antitrust Laws | 8.4(b) |
| Assumed Contracts | 2.1(b)(vii) |
| Assumed Leases | 2.1(b)(i) |
| Assumed Liabilities | 2.3 |
| Auction Date | 7.2(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Deadline | 7.2(a) |
| Bidding Procedures Order | 7.2(a) |
| Benchmark Cure Costs | 2.5(f) |
| Break-Up Fee and Expense Reimbursement | 7.4 |
| Business | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Company | Preamble |
| Competing Transaction | 7.1 |
| Cure Costs Deadline | 2.5(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| FTC | 8.4(a) |
| Initial Incremental Bid Amount | 7.2(b) |
| Leased Real Property | 5.12(a) |
| Material Contracts | 5.11 |

9

| | |
|---|---|
| Net Lease Savings | 2.5(f) |
| P&L Statements | 5.15 |
| Periodic Taxes | 11.1(a) |
| Purchased Assets | 2.1(b) |
| Purchased Intellectual Property | 2.1(b)(x) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Purchaser Loan | 3.1(c) |
| Qualified Bid | 7.2(b)(iii) |
| Qualified Bidder | 7.2(b)(ii) |
| Retained Employee | 9.1(a) |
| Sale Hearing | 7.2(a) |
| Seller or Sellers | Preamble |
| Set Off Amount | 3.1(b) |
| Subsidiary | Preamble |
| Termination Date | 4.4(a) |
| Transactions | Recitals |
| Transferred Employees | 9.1(a) |
| WARN Act | 9.1(c) |

1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ means U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of

10

reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b) Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, to the fullest extent permitted by Sections 363 and 365 of the Bankruptcy Code, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, convey and deliver to Purchaser all of Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances other than those created by Purchaser and other than Permitted Exceptions.

(b)    For all purposes of and under this Agreement, the term "Purchased Assets" means all of the properties, assets, and rights of Sellers (other than the Excluded Assets) existing as of the Closing, real or personal, tangible or intangible, including but not limited to:

(i)    all Leases of Sellers designated by the Purchaser in accordance with Section 2.5 to be assumed and assigned to the Purchaser pursuant to the Sale Order or an Assumption Order (the "Assumed Leases"), together with Sellers' interest in all security deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Assumed Leases, and Purchaser agrees to assume Leases for not less than 75 to 104 Locations;

(ii)    all Inventory as of the Closing Date, whether or not located at a Location that is subject to an Assumed Lease (an "Acquired Location"), including Inventory that the Sellers have acquired "cash in advance" or is in transit to a Location and is received by Purchaser within fourteen (14) days after the Closing Date (collectively, the "Purchased Inventory");

11

(iii)     all accounts receivable of the Sellers that relate to the Purchased Assets;

(iv)     all (x) of any Sellers' ownership rights and equity interests in the Non-Debtor Subsidiaries and (y) to the extent in the possession of Sellers, organizational documents, record books, copies of Tax and financial records and such other files, books and records of Sellers relating to the Non-Debtor Subsidiaries;

(v)     all goodwill associated with the Business or the Purchased Assets;

(vi)     all cash (including checks received prior to the close of business on the day prior to the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), commercial paper, marketable securities, certificates of deposit and other bank deposits, treasury bills and other cash equivalents (other than cash amounts in any Blocked Account or cash in the possession of the agent, any lender or participant under the DIP Credit Agreements that is credited to the loan accounts of Sellers maintained by the agent(s) in accordance with the terms of the DIP Credit Agreements, but solely to the extent that either (A) such cash has been set off against or has reduced the amount outstanding under the DIP Credit Agreements as of immediately prior to Closing, or, without double counting, (B) such cash remains held in any Blocked Account at the time of Closing, but only to the extent such cash would have been subject to set off against or reduction in the amount outstanding under the DIP Credit Agreements had the Closing not occurred);

(vii)     all Contracts of Sellers designated by the Purchaser in accordance with Section 2.5 to be assumed and assigned to the Purchaser pursuant to the Sale Order or an Assumption Order (the "Assumed Contracts"), together with the right to receive income in respect of such Assumed Contracts on or after the Closing Date, and any causes of action relating to past or present breaches of the Assumed Contracts;

(viii)     all prepaid charges and expenses of the Sellers with respect to any Purchased Asset;

(ix)     all Furniture and Equipment at any Acquired Location;

(x)     subject to Section 8.9, (x) all rights in and to Intellectual Property rights owned or licensed by Sellers to the broadest extent Sellers are permitted by law to transfer such Intellectual Property (the "Purchased Intellectual Property") and (y) to the extent such Intellectual Property may not be transferred to Purchaser, Seller shall be deemed to have granted to Purchaser an exclusive, royalty free right and license to use the Intellectual Property from and after the Closing Date, to the broadest extent permitted by law;

(xi)     the Designation Rights described in Section 2.5;

(xii)     all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business and operations of the Sellers,

12

including Tax Returns, financial statements, Documents relating to products of the Sellers, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on premises subject to a Assumed Lease, but excluding any Documents exclusively related to an Excluded Asset; provided, however, that Purchaser shall provide Sellers reasonable access to any Documents that are Purchased Asset as described in this subclause (xii);

(xiii)    all Permits used by Sellers that relate to the Purchased Assets, to the extent assignable (the "Assigned Permits");

(xiv)    subject to Section 2.6, any asset that requires the consent of a third party to be transferred, assumed or assigned notwithstanding the provisions of Section 365 of the Bankruptcy Code, as to which such consent has not been obtained as of the Closing Date; upon receipt of such consent on or after the Closing Date and entry of an appropriate Assumption Order as provided in Section 2.6; and

(xv)    any rights, claims or causes of action of Sellers against third parties relating to the Purchased Assets arising out of events occurring prior to the Closing Date, including, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, but not including the Sellers' causes of action that are identified as Excluded Assets in Section 2.2.

2.2    Excluded Assets.  Notwithstanding anything to the contrary contained herein, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under, and all obligations with respect to, the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" means:

(a)    all accounts receivable, notes receivable and other receivables related exclusively to any Excluded Executory Contract or any other Excluded Asset;

(b)    all of the real, personal, tangible (including inventory and Furniture and Equipment) or intangible (including intellectual property) property, Contract, Lease or other rights or other assets owned, used or held for use exclusively at any Location other than an Acquired Location (the "Excluded Locations");

(c)    all of the Sellers' prepaid charges and expenses paid exclusively in connection with or relating exclusively to any asset that is not a Purchased Asset;

(d)    all deposits (including security deposits for rent, electricity, telephone or otherwise), holdbacks (including credit card holdback payments), retainers or on account cash paid to the Company's professionals and advisers (whether retained in the Bankruptcy Case or

13

not) in each case related exclusively to any Excluded Executory Contracts or any other Excluded Asset;

(e)     all Contracts other than the Assumed Executory Contracts;

(f)     all personnel records of any Employees that are not Transferred Employees;

(g)     all Permits used exclusively in respect of the Excluded Locations, unless such Permits are also used or held for use in the Business outside of the Excluded Locations;

(h)     documents relating to proposals to acquire the Business by Persons other than Purchaser;

(i)     all claims, rights, interests and proceeds with respect to (i) Tax refunds, rebates, abatement or other recovery relating to Sellers' assets or the conduct of the Business for, or attributable to, the Pre-Closing Period and (ii) Taxes refunds, rebates, abatement or other recovery not exclusively relating to the Purchased Assets;

(j)     any rights, claims or causes of action of the Sellers against third parties (i) to the extent any such claim relates exclusively to an Excluded Asset or Excluded Liability and (ii) any claims under Chapter 5 of the Bankruptcy Code (other than any rights, claims or causes of action in respect of any past infringement of the Purchased Intellectual Property);

(k)     all claims or cause of actions of the Sellers against any current or former directors or officers and all rights under insurance policies, including policies providing insurance to the Sellers' respective directors and officers ("D&O Policies"), and the proceeds thereof with respect to such claims or causes of action;

(l)     all Documents exclusively related to any Excluded Asset; provided, that Sellers shall provide copies of such Documents to Purchaser upon request, at Purchaser's cost and expense;

(m)     all rights under insurance policies relating to claims for losses related exclusively to any Excluded Asset;

(n)     any shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller;

(o)     any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by Law to retain or that Sellers determine are reasonably necessary to retain including Tax Returns, financial statements and corporate or other entity filings; provided, that Sellers shall provide Purchaser reasonable access to any Excluded Asset described in this subclause;

14

(p)     any accounts receivable, deposits and other holdbacks being held by credit card companies, in each case as of the Closing Date, in connection with credit cards accepted by Sellers, including by their private label credit card company GE Money Bank, but only if, when, as and to the extent received by Purchaser (with the above designation intended to capture the line items denominated as "A/R Holdback" and "A/R Float" in the various analyses used by the parties at the Auction); and

(q)     any rights of Sellers under this Agreement.

2.3     Assumption of Liabilities. On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities (without duplication) existing as of the Closing Date (collectively, the "Assumed Liabilities") and no others:

(a)     all Liabilities of Sellers under the Assumed Executory Contracts arising after the Closing Date;

(b)     all Cure Costs related to the Assumed Executory Contracts, but not in excess of the Cure Costs Cap (for the sake of clarity, (i) unpaid Lease rents for the month of June following the Petition Date under Assumed Leases shall be included in Cure Costs and count against the Cure Costs Cap, (ii) costs and expenses with respect to Leases subject to Purchaser's obligation pursuant to Section 2.5(d) are not counted against the Cure Costs Cap, and (iii) prepaid Lease rents reimbursed pursuant to Section 2.3(c) shall not be counted against the Cure Costs Cap);

(c)     all Liabilities arising out of Purchaser's ownership of the Purchased Assets after the Closing Date, provided that Purchaser shall reimburse Sellers for the pro rata portion of rents prepaid by Sellers pursuant to Leases for the portion of July following the Closing Date, which reimbursement shall be made no later than July 20, 2007;

(d)     all Liabilities for salary, severance, vacation pay, benefits and bonuses for Transferred Employees to the extent any such liabilities (i) arose after the Petition Date or (ii) are pre-Petition Date priority (pursuant to Section 507(a)(4) of the Bankruptcy Code) unsecured claims, in either case only to the extent such Liabilities are allowed claims in the Bankruptcy Case; provided that Purchaser shall not assume any Liabilities pursuant to this paragraph in excess of Five Hundred Thousand Dollars ($500,000) in the aggregate;

(e)     all Liabilities with respect to Customer Orders to the extent such liabilities were incurred at or through a Store which had not been closed or designated for closure prior to the Petition Date or that is not, as of the Petition Date, being closed and liquidated pursuant to an agreement with Gordon Brothers;

(f)     all Liabilities of Purchaser incurred under the Transition Services Agreement, to the extent so provided in accordance with the Transition Services Agreement;

15

(g)     all Liabilities which Purchaser assumed pursuant to other provisions of this Agreement or any Purchaser Documents;

(h)     all liabilities and obligations with respect to claims arising out of the ownership of the Purchased Assets or the employment of any of the Transferred Employees after the Closing Date; and

(i)     all Liabilities of Sellers to pay claims allowed pursuant to a Final Order under Bankruptcy Code Sections 503(b)(9) or 546(c); provided, that Purchaser reserves the right to object to any such claim on any grounds in any claims allowance proceeding; and, provided, further, that Purchaser shall not assume any Liabilities pursuant to this paragraph in excess of Seven Hundred Fifty Thousand Dollars ($750,000) in the aggregate.

2.4     Excluded Liabilities.  Purchaser shall not assume and shall be deemed not to have assumed, and Sellers shall be solely and exclusively liable with respect to, (i) the Excluded Environmental Liabilities, but only to the extent of applicable law, or (ii) any other Liabilities of Sellers of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, other than the Assumed Liabilities (collectively, the "Excluded Liabilities").

2.5     Executory Contract Designation.

(a)     Subject to Purchaser's right to designate any or all Executory Contracts prior to the Designation Deadline pursuant to Section 2.5(b), Purchaser has elected to not have any Executory Contract assumed and assigned to it on the Closing Date, except as provided in the Sale Order.  Notwithstanding any prior designations, Sellers shall take all necessary action (including, if appropriate, notifying the Bankruptcy Court and applicable landlords) to provide that no other Executory Contract will be an Assumed Contract or Assumed Lease on the Closing Date, and Purchaser shall have the right to designate any or all Executory Contracts in accordance with Section 2.5(b) after the Closing Date.

(b)     On or prior to the Designation Deadline, Purchaser may designate any Executory Contract that the Sellers have not rejected pursuant to Section 365 of the Bankruptcy Code as an Assumed Contract or Assumed Lease without being required to pay the Sellers any additional Purchase Price, and Sellers shall use their reasonable efforts to seek an Assumption Order with respect any such Executory Contract so designated; provided, however, that Purchaser shall be obligated to pay any Cure Costs with respect to any such Assumed Executory Contract; and provided, further, however, that Purchaser timely advances or reimburses Sellers for any and all costs (including the professional fees associated with) related to or incurred in connection with obtaining for the Sellers the entry of an Assumption Order with respect to such Executory Contract.  Purchaser shall pay, satisfy or otherwise discharge its obligations with respect to Cure Costs related to the assumption and assignment of such Executory Contracts no later than forty-five (45) days after entry of the Assumption Order with respect to such Executory Contracts assumed or assigned to Purchaser pursuant to this Section 2.5(b) (the "Cure Costs Deadline").

16

(c) From the Effective Date through and including the Cure Costs Deadline, Sellers shall not reject any Executory Contract unless otherwise agreed to, in writing, by Purchaser.

(d) From the Closing Date through and including the Cure Costs Deadline (or, with respect to a Store lease, such date that Purchaser shall have removed the Purchased Inventory from such Store), Purchaser shall advance or reimburse all of Sellers' costs and expenses with respect to any Executory Contract that Purchaser has not (i) agreed that Sellers may reject pursuant to Section 2.5(c) or (ii) provided Sellers with written notice that such Executory Contract will not be assumed and assigned pursuant to Section 2.5(a) or (b) above.

(e) Notwithstanding the foregoing provisions of this Section 2.5:

(i) in no event shall Purchaser be obligated to pay Cure Costs in excess of the Cure Cost Cap, and the Sellers shall timely pay, satisfy or otherwise discharge, as Excluded Liabilities, all obligations with respect to the Cure Costs in excess of the Cure Costs Cap, and such limitation on Purchaser's obligation to pay Cure Costs shall not in any way impair Purchaser's right and ability to designate Executory Contracts to be assumed and assigned to it pursuant to this Section 2.5; and

(ii) in accordance with Section 3.1(b), Purchaser may set off against, and satisfy its obligation to pay, any Cure Costs by up to the Set Off Amount by so notifying the Sellers not less than five (5) Business Days in advance, and the Sellers shall be responsible for, and shall timely pay, satisfy or otherwise discharge, as Excluded Liabilities, all obligations with respect to such Cure Costs in the amount of the Set Off Amount, and the exercise by Purchaser of such right of set off shall not in any way impair Purchaser's right and ability to designate Executory Contracts to be assumed and assigned to it pursuant to this Section 2.5.

(f) Sellers shall cooperate with Purchaser from the Closing Date through and including the Cure Costs Deadline to reduce Cure Costs and negotiate rent reductions with respect to Leases that are Executory Contracts. In consideration for such cooperation, Purchaser shall pay Sellers 20% of the Net Lease Savings (as defined below) in excess of $2,000,000; provided that the aggregate payment obligation of Purchaser pursuant to this Section 2.5(f) shall not exceed Two Hundred Twenty Thousand Dollars ($220,000). For purposes of this section, "Net Lease Savings" shall mean the aggregate reduction in Purchaser's obligation to pay Benchmark Cure Costs (as defined below) with respect to Assumed Leases plus the net present value (using a discount factor of 10%) of any rent reductions from the existing terms under any such Assumed Lease for the duration of such lease which are agreed to by the lessor after the Closing Date and prior to the time such Lease has been designated by Purchaser pursuant to Section 2.5(b). Within thirty (30) days following the Closing Date, Sellers, Purchaser and the Committee shall, acting reasonably and in good faith, agree on a schedule of Cure Costs for each Assumed Lease (the "Benchmark Cure Costs"), which shall be used as the target for calculating Net Lease Savings.

17

2.6     Assignment of Contracts and Rights. To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets and the Sellers' rights to the Intellectual Property shall be assumed and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in an Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party would constitute a breach or in any way adversely affect the rights of the Purchaser or Seller thereunder. If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure to pay Cure Costs which are not Assumed Liabilities, then such Purchased Assets shall not be transferred hereunder and the Closing shall proceed with respect to the Remaining Purchased Assets without any reduction in Purchase Price or further obligation of the Sellers with respect thereto.

2.7     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, to the extent permitted by law, Sellers shall, or shall cause their Affiliates to, make available to Purchaser such non-confidential data in personnel records of any Transferred Employee or Retained Employee as is reasonably necessary for Purchaser to determine whether to employ such Retained Employee or transition such employees into Purchaser's records.

(b)     From time to time following the Closing, Sellers shall, or shall cause their Affiliates to, transfer to the Purchaser any Purchased Assets received by or in the possession of the Sellers.

(c)     From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions.

## ARTICLE III

## CONSIDERATION

3.1     Purchase Price.

(a)     The aggregate cash consideration for the Purchased Assets (the "Purchase Price") shall be equal to Thirty Eight Million Dollars ($38,000,000), subject to adjustment as provided in this Section 3.1.

18

(b)     A portion of the Purchase Price shall be withheld from the cash paid at Closing and shall be retained by Purchaser subject to this Section 3.1(b); provided, however, such portion shall, at the request of Sellers after Closing, be paid into an escrow account, with the escrow agent and escrow agreement to be mutually acceptable to Purchaser and Sellers ("the Closing Escrow"). Unless the parties agree otherwise based on a preliminary inventory of the Purchased Inventory (or other estimate of the Cost Value of the Purchased Inventory) to be conducted immediately prior to the Closing, the portion of the Purchase Price to be so withheld or paid into the Closing Escrow shall be Three Million Dollars ($3,000,000). The Purchase Price shall be reduced dollar for dollar by the amount, if any, that the Cost Value of the Purchased Inventory, as determined in accordance with Section 4.7, is less than Forty Three Million Four Hundred Seventy Four Thousand Dollars ($43,474,000). Promptly upon determination of the Cost Value, the balance so withheld or held in the Closing Escrow shall be distributed to Purchaser and/or Sellers, as applicable, with a pro rata share of any income earned being allocated between Purchaser and Sellers on the same basis (using actual earnings while held in the Closing Escrow and an assumed rate of interest of five percent (5%) per annum while held by Purchaser). In the event that Purchaser has paid to the Sellers (including for this purpose any credit bid in accordance with Section 3.1(c) as a payment) more than they were entitled to under this Section 3.1 after taking into account the adjustment provided in this Section 3.1(b), the Sellers shall promptly return to Purchaser such excess and, to the extent Sellers have not done so, Purchaser shall be entitled, in accordance with Section 2.5(e), to set off against Cure Costs any such amount which Sellers have failed to return (such amount, the "Set Off Amount").

(c)     To the extent that the Purchaser or any Affiliate thereof is or becomes a secured lender to any of the Sellers (the principal, interest, premium and any other amounts due to Purchaser or such Affiliate under any such loan (the "Purchaser Loan") as of the Closing Date being referred to as the "Credit Bid Amount"), Purchaser may reduce the Purchase Price by the Credit Bid Amount by (i) either (x) delivering fully executed releases with respect to the full amount of the Purchaser Loan or (y) assuming the Sellers' obligations with respect to the full amount of the Purchaser Loan and (ii) paying the balance of the Purchase Price after reducing the Purchase Price by the amount of the Credit Bid Amount in full in cash in accordance with this Section 3.1.

3.2     Purchase Price Deposit. Upon the execution of this Agreement, Purchaser shall deliver to Sellers cash equal to Three Million Eight Hundred Thousand Dollars ($3,800,000) (the "Deposit"), which Deposit shall be held by Sellers in a separate segregated account and applied as follows:

(a)     if the Closing shall occur, the Deposit shall be applied towards the payment of the Purchase Price;

(b)     if this Agreement is terminated by Sellers pursuant to Section 4.4(f), the Sellers shall be entitled to retain the Deposit; and

(c)     if this Agreement is terminated other than by Sellers pursuant to Section 4.4(f), the Sellers shall promptly return the Deposit to the Purchaser;

19

provided, however, that if Purchaser or any Affiliate thereof is or becomes a secured lender to any of the Sellers, Purchaser shall have no obligation to deliver the Deposit; provided, further, that in the event that the Agreement is terminated by the Sellers pursuant to Section 4.4(f), the amount of any outstanding obligations of the Sellers under Purchaser Loan shall be automatically reduced by the amount of the Deposit.

## ARTICLE IV

## CLOSING, INVENTORY TAKING AND TERMINATION

4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Milbank, Tweed, Hadley & McCloy LLP in New York City (or at such other place as the parties may designate in writing) at 10:00 a.m. (New York City time) on the date the conditions set forth in Article X are satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  The parties agree to use their commercially reasonable best efforts to cause the Closing to occur July 13, 2007.

4.2    Deliveries by Sellers.  At the Closing, Sellers shall deliver to Purchaser:

(a)    one or more duly executed bills of sale in a form to be agreed upon the parties hereto;

(b)    one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    the officer's certificate required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(d)    affidavits executed by each Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(e)    an executed copy of the Sale Order;

(f)    all other documents, instruments or writings of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be reasonably necessary to convey the Purchased Assets to Purchaser, such documents to be identified and provided by Purchaser to Sellers in a form acceptable to the Purchaser on or before the Closing Date;

20

(g)     one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto with respect to each of the Assumed Leases and Assumed Contracts; and

(h)     such other documents, instruments and certificates as the Purchaser may reasonably request, such documents to be identified and provided to Purchaser by Sellers in a form acceptable to the Purchaser on or before the Closing Date.

4.3     <u>Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver:

(a)     cash in the amount of the Purchase Price, net of the amount withheld pursuant to <u>Section 3.1(b)</u> and the Credit Bid Amount in accordance with <u>Section 3.1(c)</u>;

(b)     one or more duly executed assignment and assumption agreements in a form to be agreed upon the parties hereto;

(c)     the officer's certificate required to be delivered pursuant to <u>Sections 10.2(a)</u> and <u>10.2(b)</u>;

(d)     a copy of Purchaser's executed side letter agreement with GE Money Bank and evidence of Purchaser's satisfaction of its obligation to pay the Cash Collateral (as defined therein) as security for Purchaser's continuing obligations thereunder; and

(e)     such other documents, instruments and certificates as the Sellers may reasonably request, such documents to be identified and provided by Sellers to Purchaser in a form acceptable to the Sellers on or before the Closing Date.

4.4     <u>Termination of Agreement</u>. This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Sellers, if the Closing shall not have occurred by the close of business on August 15, 2007 (the "<u>Termination Date</u>"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or a Seller, then the breaching party may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u>;

(b)     by mutual written consent of Sellers and Purchaser;

(c)     by Purchaser, if any condition to the obligations of Purchaser set forth in <u>Section 10.1</u> or <u>10.3</u> shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d)     by Sellers, if any condition to the obligations of Sellers set forth in <u>Section 10.2</u> or <u>10.3</u> shall have become incapable of fulfillment other than as a result of a breach

21

by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(e) by Purchaser, if there shall be a breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.1 or 10.3 and which breach has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Purchaser to Sellers of such breach and (ii) the Termination Date;

(f) by Sellers, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 10.2 or 10.3 and which breach has not been cured by the earlier of (i) 10 Business Days after the giving of written notice by Sellers to Purchaser of such breach and (ii) the Termination Date;

(g) by Sellers or Purchaser if there shall be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(h) by Purchaser, if (i) the Sale Order with respect to the Transactions or (ii) a sale order with respect to a Competing Transaction has not been entered on or before July 13, 2007;

(i) by Purchaser, if the Sale Order with respect to the Transactions has been entered and (i) Purchaser has provided Sellers with written notice that it is prepared to consummate the Transactions and (ii) the Closing Date does not occur within two (2) Business Days of Purchaser providing the Sellers with such notice;

(j) by Purchaser, if the Auction Date is not on or before July 10, 2007;

(k) [INTENTIONALLY OMITTED]; and

(l) automatically, upon the earlier to occur of (i) the consummation of a Competing Transaction and (ii) twenty-five (25) days after the entry of a Sale Order with respect to a Competing Transaction.

4.5     Procedure Upon Termination. In the event of termination pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties and to the Committee, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Sellers. If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the Transactions, whether so obtained before or after the execution hereof, to the party furnishing the same.

22

4.6    Effect of Termination. In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Sellers; provided, however, that the provisions of Articles VII and XII hereof shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this Section 4.6 shall be deemed to release any party from liability for any breach of its obligations under this Agreement.

4.7    Inventory Taking for Post-Closing Purchase Price Adjustment.

(a)    Inventory Taking. Sellers and Purchaser shall cause to be taken a SKU and retail price physical inventory of the Purchased Inventory located in all Locations (the "Inventory Taking"), which Inventory Taking shall be completed no later than ten (10) business days after the Closing Date (the "Inventory Completion Date"), and the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store). Purchaser shall conduct the Inventory Taking, without any requirement for an independent inventory taking service. The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as Schedule 4.7, including a requirement that senior representatives of Sellers, Purchaser and the Committee shall be personally present at the Inventory Taking at the first two (2) Stores in order to establish the standards for the Inventory Taking in the remaining Stores (the "Inventory Taking Instructions") and Purchaser certify that the results are in conformity with the requirements of this Section 4.7. Purchaser shall be responsible for the expenses of the Inventory Taking, provided that Sellers shall bear their own costs and expenses relative to the Inventory Taking (e.g., for being present at such Inventory Taking). Sellers, Purchaser and a representative of the Committee may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking. Purchaser agrees that during the conduct of the Inventory Taking in each of the Stores, the applicable Stores shall be closed to the public and no sales or other transactions shall be conducted. Sellers and Purchaser agree to cooperate with each other to conduct the Inventory Taking commencing at a time that would minimize the number of hours that such locations would be closed for business.

(b)    Gross Rings. For the period from the Closing Date until the Inventory Date for each Store, Purchaser shall keep a strict count of register receipts and reports to determine the actual Cost Value of the merchandise sold by SKU. All such records and reports shall be made available to Purchaser and Seller during regular business hours upon reasonable notice. The Cost Value of Purchased Inventory shall be calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.5% of the aggregate Cost Value of Purchased Inventory sold during the Gross Rings period.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby jointly and severally represents and warrants to Purchaser that:

23

5.1     Organization and Good Standing. Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and in each jurisdiction where it is qualified to do business, subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. Schedule 5.1 sets forth each Seller, the jurisdiction of its organization and each jurisdiction in which it is qualified to do business.

5.2     Authorization of Agreement. Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each Seller. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto, the entry of the Sale Order and receipt of such other authorization as is required by the Bankruptcy Court) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of each Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     Conflicts; Consents of Third Parties.

(a)     The execution and delivery by each Seller of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the Transactions contemplated hereby and thereby, or compliance by such Seller with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of such Seller; (ii) subject to entry of the Sale Order, any Contract, Lease or Permit to which such Seller is a party or by which any of the properties or assets of such Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to such Seller or any of the properties or assets of such Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (i), (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Change.

(b)     Except as set forth on Schedule 5.3(b) and except to the extent not required if the Sale Order is entered, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required

24

on the part of Sellers in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assignment or conveyance of the Purchased Assets, or the taking by Sellers of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, if any, (ii) the entry of the Sale Order and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Change.

5.4    Title to Purchased Assets. Sellers either own or have the right to transfer the Purchased Assets, and, subject to the entry of the Sale Order, Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

5.5    Taxes.

(a)    To the Knowledge of the Sellers, Sellers have timely filed all Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers). To the Knowledge of the Sellers, the Sellers have not received any written notice or written inquiry from any jurisdiction where the Sellers do not currently file Tax Returns to the effect that such filings may be required with respect to the Purchased Assets or the Business, or that the Business may otherwise be subject to taxation by such jurisdiction. No power of attorney currently in force has been granted by the Sellers with respect to the Business that would be binding on Purchaser with respect to taxable periods commencing on or after the Closing Date. To the Knowledge of the Sellers, except as to Taxes of Sellers the payment of which is or will be prohibited or stayed by the Bankruptcy Code, each Seller has paid all Taxes due and payable by it (whether or not such Taxes are shown on any Tax Return). Other than those set forth on Schedule 5.5(a), there are no Tax Liens on any of the Purchased Assets other than Permitted Exceptions.

(b)    None of the Sellers is a foreign person within the meaning of Section 1445(f)(3) of the Code.

5.6    Intellectual Property. Except as set forth on Schedule 5.6, Sellers own or have valid licenses to use all material Purchased Intellectual Property. Except as set forth on Schedule 5.6, no claims are pending against Sellers before a Governmental Body or, to the Knowledge of Sellers, threatened with regard to the ownership by Sellers of any Purchased Intellectual Property.

5.7    Permits. Schedule 5.7 sets forth a true, complete and correct list of all material Permits held by Sellers as of the Execution Date. Except as set forth on Schedule 5.7 and as may have resulted from the commencement of the Bankruptcy Case, all Permits (a) are valid and in full force and effect and, to the Knowledge of the Sellers, none of the Sellers are in default under or in violation of any such Permit, except for such defaults or violations which would not

25

reasonably be expected, individually or in the aggregate, to cause a Material Adverse Change and no suspension or cancellation of any such Permits is pending (other than pursuant to its terms) or threatened and (b) except as set forth on Schedule 5.7 and subject to entry of the Sale Order and the provisions of Section 2.6 hereof, may be transferred or reissued to Purchaser in accordance with this Agreement and without the approval of any third party (other than the Bankruptcy Court)

5.8    Environmental Matters.

(a)    Except as set forth on Schedule 5.8 and except as would not reasonably be expected to have a Material Adverse Change, Sellers are in compliance with all applicable Environmental Laws. No Seller has received written, or to the Knowledge of the Sellers, oral, notice of any pending or, to the Knowledge of the Sellers, threatened claim or investigation by any Governmental Authority or any other Person concerning material potential liability of any Seller under Environmental Laws in connection with the ownership or operation of the Business, the Real Property or any real property currently owned, leased or occupied by a Seller. To the Knowledge of the Sellers, there has not been a Release to the Environment of any Hazardous Substance at, upon, in, from or under (i) any of the Real Property or any property currently owned or leased by a Seller or (ii) at any location to or from which a Seller has transported or arranged for the transportation or disposal of Hazardous Substances, in each case, in quantities or under circumstances that would give rise to any material liability or require remediation, investigation or clean up pursuant to any Environmental Law.

(b)    To the Knowledge of Sellers, Sellers have provided or made available to Purchaser written non-privileged environmental reports in the possession of Sellers regarding the presence or migration of Hazardous Substances on, in or under the Real Property and any property currently owned or leased.

(c)    Except as set forth on Schedule 5.8(c) and except as would not reasonably be expected to have a Material Adverse Change, no material capital or other expenditures are required to reach or maintain compliance with current Environmental Laws with respect to the operations of the Business or the Purchased Assets.

5.9    Employee Benefits.

(a)    Schedule 5.9(a) sets forth a complete and correct list of all Employee Benefit Plans of the Sellers.

(b)    Each Employee Benefit Plan has been operated and administered in all material respects in accordance with its terms and applicable law, except where any failure to be so operated and administered would not, individually or in the aggregate, be expected to have a Material Adverse Change or as otherwise resulting from the Bankruptcy Case.

(c)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and the trusts maintained thereunder are exempt from taxation under Section 501(a) of the Code.

26

(d)     There are no pending, or to the Knowledge of Sellers, threatened claims by or on behalf of any Employee Benefit Plan, by any employee or beneficiary covered under any such Plan, or otherwise involving any such Employee Benefit Plan (other than routine claims for benefits).

(e)     No amounts payable under the Employee Benefit Plans will fail to be deductible for federal income tax purposes by virtue of Section 280G of the Code.

(f)     There are no material outstanding Liabilities of, or related to, any Employee Benefit Plan, other than Liabilities for benefits to be paid in the ordinary course to participants in such Employee Benefit Plan and their beneficiaries in accordance with the terms of such Employee Benefit Plan or as otherwise resulting from the Bankruptcy Case.

5.10     Litigation. Except as set forth on Schedule 5.10, there are no Legal Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Change on the Business of the Sellers or the Purchased Assets.

5.11     Material Contracts.

(a)     Schedule 5.11(a) contains a correct and complete list, as of the date hereof, of all Contracts (the "Material Contracts") pursuant to which any Seller has any rights or benefits or undertakes any obligations or liabilities with respect to the Business, that:

(i)     has a duration of one year or more and is not terminable without penalty upon 90 days or less prior written notice by any party;

(ii)     requires or could reasonably be expected to require any party thereto to pay $25,000 or more in any 12 month period, or $100,000 or more in the aggregate;

(iii)     requires any severance, retention, or other termination payments to its employees on or after the Closing Date;

(iv)     contains any non-competition covenant or exclusivity arrangement;

(v)     involves any contract (i) granting or obtaining any right to use any Intellectual Property (other than contracts granting rights to use readily available commercial Software having an annual license and/or maintenance fee of less than $10,000 in the aggregate for all such related contracts) or (ii) restricting the Sellers' rights to any Purchased Intellectual Property.

(vi)     regards the employment, services, consulting, termination or severance from employment relating to or for the benefit of any director, officer, employee, sales agent, distributor, dealer, independent contractor or consultant;

27

(vii)    constitutes joint venture, partnership and similar contracts involving a sharing of profits or expenses (including but not limited to joint research and development and joint marketing contracts); or

(viii)    constitutes master lease agreements providing for the leasing of material personal property.

(b)    Except as set forth in Schedule 5.11(b): (i) all of the Material Contracts are in full force and effect, (ii) except for breaches and defaults of the type referred to in Section 365(b)(2) of the Bankruptcy Code, none of the Sellers and to the Knowledge of the Sellers, none of the other parties to the Material Contracts, are in material default under, and no event has occurred which, with the passage of time or giving of notice or both, would result in the Sellers or to the Knowledge of the Sellers, any of the other parties to the Material Contracts, being in material default under, any of the terms of the Material Contracts, and (iii) to the Knowledge of Sellers, none of the Material Contracts requires the consent of any other party thereto in connection with the transactions contemplated by this Agreement except, in the case of clauses (i), (ii) and (iii) above, as have not had, or would not reasonably be expected to have, a Material Adverse Change.

5.12    Property.

(a)    Schedule 5.12(a) sets forth the address or other description of each parcel of Leased Real Property, and a true, correct and complete list of all Leases for each Leased Real Property held by the Sellers (including the date, if available, and name of each of the parties to such Lease document). The Sellers have delivered or made available to the Purchaser a true and complete copy of each of the aforementioned Lease documents and, except as set forth on Schedule 5.12(a), such Leases have not been amended, modified, restated or otherwise supplemented. Except as set forth in Schedule 5.12(a), with respect to each of the aforementioned Leases: (i) except as results from the pendency of the Bankruptcy Case, Sellers have a valid and subsisting leasehold estate in and the right to quiet enjoyment of such Leased Real Property for the full term of such Lease, and such Lease is legal, valid, binding and enforceable against the applicable Seller and in full force and effect; (ii) except as results from the pendency of the Bankruptcy Case, the Sellers have not received written notice of any current default thereunder (or condition or event, which, after notice or a lapse of time or both, would constitute a default thereunder); (iii) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (iv) the Sellers do not owe, nor will they in the future owe, any brokerage commissions or finder's fees with respect to such Lease; (v) except as set forth on Schedule 5.12(a), the other party to such Lease is not an Affiliate of, and otherwise does not have any economic interest in, the Sellers; (vi) except as set forth on Schedule 5.12(a), there are no Liens on the estate or interest created by such Lease created or suffered to exist by the Sellers that will not be extinguished pursuant to the Sale Order as against such estate or interest; (vii) except as set forth on Schedule 5.12(a), no Seller and, to the Knowledge of the Sellers, no other party to such Lease has assigned the same or sublet any part of the premises covered thereby or exercised any option or right thereunder; (viii) no material penalties are accrued or unpaid under any Lease; (ix) except as set forth on Schedule 5.12(a), no consent of any third party under such

28

Lease is necessary with respect to the Purchaser's acquisition of the Purchased Assets, nor will such Lease be terminable or in default as a result of the consummation of the transactions contemplated thereby.

5.13    Brokers.  Except for the fees and expenses of Peter J. Solomon & Co. (for which Sellers shall be solely responsible), and subject to approval of the Bankruptcy Court, the Sellers do not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions.

5.14    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers, the Sellers' Business, the Purchased Assets, the Assumed Liabilities or the Transactions, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers, or any of Sellers' or their Affiliates' respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), each Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Sellers or any of its Affiliates).  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), Sellers makes no representations or warranties to Purchaser regarding the probable success or profitability of the Sellers' Business.  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Change to the Sellers.

5.15    Financial Statements.  The Sellers have provided to Purchaser a true and complete copy of: (i) the unaudited balance sheet and statement of income from operations for the six months ended March 31, 2007 (the "Actual Financial Statements"); (ii) profit and loss statements at store levels for the year ended September 30, 2006 ("P&L Statements"); and (iii) the audited consolidated financial statements as of and for the year ended September 30, 2006 (the "Audited Financial Statements" and together with Actual Financial Statements and P&L Statements, the "Financial Statements").  The Financial Statements fairly present in all material respects the consolidated financial position, results of operations and cash flows of the Sellers for the respective fiscal periods or as of the respective dates set forth therein in accordance with GAAP.

5.16    Board Approval and Recommendation.  The Board of Directors of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation

29

of Competing Transactions, a sale, assignment and assumption of the Purchased Assets and Assumed Contracts pursuant to this Agreement under sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of the Company and its subsidiaries.

5.17    Acknowledgment. Sellers hereby acknowledge that, other than the obligations of Purchaser set forth in this Agreement, Purchaser does not have any obligation to further bid or overbid for the Purchased Assets or participate in any auction at which Qualified Bidders (as defined below) bid to acquire the assets of the Business.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser hereby represents and warrants to Sellers that:

6.1    Organization and Good Standing. It is an entity duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2    Authorization of Agreement. It has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of it. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by it and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of it enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3    Conflicts; Consents of Third Parties.

(a)    The execution and delivery by it of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by it with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) its certificate of incorporation or bylaws (ii) any Contract, Lease or Permit to which it is a party or by which any of its properties or assets are bound; (iii) any Order of any Governmental Body applicable to it or any of its properties or assets as of the

30

date hereof; or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to cause, individually or in the aggregate, a Material Adverse Change.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by it with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, its taking of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a material adverse change.

6.4     Brokers.  Purchaser does not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions.

6.5     Adequate Assurance.  Purchaser will timely provide such information to Sellers, as Sellers believe is reasonably necessary to provide "adequate assurance," as that term is used in Section 365 of the Bankruptcy Code, with respect to Assumed Leases and Assumed Contracts.

6.6     Condition of the Purchased Assets.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis. Purchaser acknowledges that it will conduct its own due diligence and in making the determination to proceed with the Transaction, Purchaser will be relying on the results of its own independent investigation.

6.7     Communications with Customers and Suppliers.  Prior to the Closing, the Purchaser shall not, and shall cause its Affiliates and representatives not to, contact, or engage in any discussions or otherwise communicate with, any of the Business's customers, suppliers and others with whom it has material commercial dealings without obtaining the prior consent of Seller (which will not be unreasonably withheld but, if given, may be conditioned on Seller having the right to designate an officer of Seller reasonably acceptable to Purchaser, to participate in any meetings or discussions with any such customers, suppliers or others).

31

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1     Competing Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a plan of reorganization, refinancing or liquidation) the consummation of which would be substantially inconsistent with the Transactions (a "Competing Transaction"). Nothing contained herein shall be construed to prohibit Sellers and its representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Transaction.

7.2     Bidding Procedures Order.

(a)     The Sellers shall use commercially reasonable efforts to obtain on or before June 26, 2007, an order of the Bankruptcy Court for authority to observe and perform its obligations under this Section 7.2 (the "Bidding Procedures Order"). The Bidding Procedures Order shall, among other things, (1) approve the Break-Up Fee and Expense Reimbursement (as defined below), and provide that the Purchaser's claim to the Break-Up Fee and Expense Reimbursement under this Section 7.2 shall be entitled to superpriority administrative claim treatment in the Bankruptcy Cases, senior to all other superpriority claims (except those granted with respect to any DIP Facility) and that the Break-Up Fee and Expense Reimbursement must be paid to Purchaser in full upon consummation of a Competing Transaction or, if no such transaction is consummated within thirty (30) days following Bankruptcy Court approval of a Competing Transaction, within ten (10) days following the expiration of such 30 day period, (2) authorize the Purchaser to credit bid the amount of the Break-Up Fee and Expense Reimbursement at any auction at which Qualified Bidders may bid, (3) establish a date no later than July 9, 2007, by which initial Qualified Bids (as defined below) must be submitted (the "Bid Deadline"), (4) approve the Bidding Procedures for the solicitation of higher and otherwise better bids (whether in a single Qualified Bid, a collection of Qualified Bids, or in concert with the Company's other restructuring alternatives) that, among other things, sets a date no later than July 10, 2007 for an auction at which only Qualified Bidders (as defined below) who have previously submitted a Qualified Bid may bid (the "Auction Date"), (5) set the Initial Incremental Bid Amount (as defined below) for any Qualified Bid and Subsequent Incremental Bid Amount (as defined below) for any subsequent bid, and (6) establish the date no later than July 13, 2007 for the hearing on the proposed sale of the Purchased Assets to the Purchaser or to such Qualified Bidder submitting the highest or otherwise best bid at the Auction (the "Sale Hearing"). The Sellers agree that they shall represent to the Bankruptcy Court that Sellers actively solicited this "stalking horse" bid from the Purchaser. The Bidding Procedures Order shall be in form and substance reasonably acceptable to Purchaser and its counsel and Sellers hereby agree not to change or modify any of the dates or procedure set forth in the Bidding Procedures Order, including without limitation the dates of the Sale Hearing and Closing Date, without the prior written consent of Purchaser.

32

(b)     For the purposes of this section:

(i)     The "Initial Incremental Bid Amount" shall mean the sum of the Break-Up Fee and Expense Reimbursement and $500,000;

(ii)    A "Qualified Bidder" is a person (a) who has delivered to the Company an executed confidentiality agreement in form and substance acceptable to the Sellers, (b) who has delivered to the Company a bid that identifies assets of the Company to be acquired by the bidder and the consideration to be paid for such assets that constitutes a Competing Transaction, and (c) whom the Company in good faith determines is reasonably likely (based on availability of financing, experience and other considerations) to be able to consummate a transaction based on the Competing Transaction, if selected as the successful bidder. The Purchaser shall be deemed a Qualified Bidder.

(iii)   A "Qualified Bid" is a Competing Transaction (a) the value of which (whether viewed separately or together with other competing proposals evidenced by Qualified Bids and/or the Company's restructuring alternatives) is greater or otherwise better than the sum of (i) the Purchase Price and (ii) the Initial Incremental Bid Amount (as defined above), (b) that is accompanied by an executed copy of an alternative purchase agreement that reflects any substantive changes to this Agreement, a representation that the Qualified Bidder will make all necessary HSR filings, pay all costs and expenses associated with such filings (including the costs and expenses of the Sellers) and satisfactory evidence of committed financing or other ability to perform and (c) that is accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price offered in the proposal for a Competing Transaction.

(iv)    The "Subsequent Incremental Bid Amount" shall be an amount equal to $250,000.

7.3     Submission to Bankruptcy Court. Within three (3) days following the Effective Date, Sellers shall file with the Bankruptcy Court this Agreement and such notices as may be appropriate in connection therewith. Purchaser shall cooperate with Sellers in obtaining Bankruptcy Court approval of the Bidding Procedures Order and the Sale Order.

7.4     Break-Up Fee and Expense Reimbursement. The Bidding Procedures Order shall provide that the Purchaser, provided that Purchaser is not in default under this Agreement, shall be entitled to be paid an amount equal to 3% of the Purchase Price as a combined break-up fee and expense reimbursement (the "Break-Up Fee and Expense Reimbursement") if (a) the Bankruptcy Court approves a Competing Transaction with a Qualified Bidder other than the Purchaser and (b) the Sellers either consummate such an alternative transaction or fail to consummate a transaction with the Purchaser or any other Qualified Bidder. The Break-Up Fee and Expense Reimbursement described in this Section 7.4 shall be paid (i) upon the occurrence of the consummation of the Competing Transaction, by the winning Qualified Bidder or (ii) if no transaction (including a transaction with the Purchaser) is consummated within twenty-five (25) days following Bankruptcy Court approval of such Competing Transaction, by the Sellers.

33

Except as provided herein, Purchaser shall not be entitled to any portion of the Break-Up Fee and Expense Reimbursement.

7.5     Sale Order.  Subject to Section 7.1, Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code.  In the event the entry of the Sale Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

8.1     Access to Information.  Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, business and operations of Sellers and such examination of the books and records and financial and operating data of Sellers, the Business, the Purchased Assets, the Assumed Liabilities and the Leased Real Property, and access to all the officers, key employees, accountants and other representatives of Sellers, as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation, examination and access, and Purchaser and its representatives shall cooperate with Sellers and their representatives and shall use their reasonable efforts to minimize any disruption to their business.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers to disclose information subject to attorney-client privilege, provided Sellers advise Purchaser of the specific assertion of such privilege.

8.2     Conduct Pending the Closing.

(a)     Except (i) as expressly set forth in the Approved Budget, (ii) as required by applicable Law, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Purchaser, during the period from the date of this Agreement to and through the Closing Date, Sellers shall, to the extent commercially reasonable, taking into account the filing of the Bankruptcy Case:

(A)     conduct their business only in the ordinary course; and

34

(B)     use their commercially reasonable efforts to (A) preserve their present business operations, organization and goodwill, and (B) preserve their present relationships with customers and suppliers.

(b)     Except (i) as expressly set forth in the Approved Budget, (ii) as required by applicable Law, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Purchaser, Sellers shall not:

(A)     make any promise or representation, oral or written, to, or otherwise (1) increase the annual level of compensation payable or to become payable by Sellers to any of their respective directors, executive officers or Employees, (2) grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director, executive officer or Employee, (z) increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (3) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving a director, executive officer or Employee of such Seller, except, in each case, as required by any of the Employee Benefit Plans or Employee Agreements;

(B)     enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability or other obligation to any labor organization;

(C)     subject any of the Purchased Assets to any Lien, Interest or Encumbrance, except for Permitted Exceptions;

(D)     cancel or compromise any material debt or claim or waive or release any material right of Sellers that constitutes a Purchased Asset other than customer accounts receivable compromised in the ordinary course of the business of Sellers;

(E)     enter into any commitment for capital expenditures other than as set forth in the Approved Budget;

(F)     engage in any transaction with any officer, director or Affiliate of any Seller or affiliate of any such individual;

(G)     sell, pledge, dispose of, transfer, lease, license or encumber or permit to lapse or authorize the sale, pledge, disposition, transfer, lease, license, or encumbrance of, any Purchased Assets except in the ordinary and usual course of business consistent with past practices and as would not constitute a Material Adverse Change;

35

(H)     transfer, dispose of, permit to lapse (except in accordance with the terms thereof) or grant any right or licenses under, or enter into any settlement regarding the breach or infringement of, any Intellectual Property, or modify any existing rights with respect thereto or enter into any material licensing or similar agreements or arrangements other than such licenses, agreements or arrangements entered into in the ordinary course of business consistent with past practices and as would not constitute a Material Adverse Change;

(I)     enter into, assume or terminate any Material Contract or enter into or permit any material amendment, supplement, waiver or other material modification in respect thereof, except in the ordinary and usual course of business consistent with past practices and as would not constitute a Material Adverse Change;

(J)     adopt or propose any change in its certificate of incorporation or bylaws, except a change that would not have any adverse effect on the contemplated Transactions;

(K)     declare, set aside, or pay any dividend or other distribution with respect to any shares of its capital stock, or split, combine, or reclassify any of its capital stock, or repurchase, redeem, or otherwise acquire any shares of its capital stock;

(L)     other than as a result of the Transactions, no Seller shall merge or consolidate with any other Person or acquire a material amount of assets of any other Person;

(M)     make a Material Decision; and

(N)     agree to do anything prohibited by this Section 8.2 or do or agree to do anything that would cause Sellers' representations and warranties herein to be false in any material respect.

8.3     Consents. Sellers shall use their commercially reasonable efforts, and Purchaser shall cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that neither Sellers nor Purchaser shall be obligated to pay any consideration therefore to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval; provided, further, that if requested by the Purchaser, the Sellers shall initiate such litigation or legal proceedings requested by the Purchaser to obtain such consents or approvals or an Order but only if the Purchaser advances to the Sellers, the Sellers' good faith and reasonable estimate of any and all out of pocket expenses and costs (including reasonable attorneys fees) related thereto. With respect to any Executory Contract for which any consent or approval is required in order for such Executory Contract to become an Assumed Contract or

36

Assumed Lease notwithstanding the Sale Order, Sellers shall maintain such Executory Contract in accordance with Section 2.5 and shall provide Purchaser with the benefit thereof pursuant to the Transition Services Agreement.

## 8.4 Regulatory Approvals.

(a) If necessary, Purchaser and Sellers shall (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the Transactions as promptly as practicable and, in any event, within ten (10) Business Days after the date hereof in the case of all filings required under the HSR Act and within four weeks in the case of all other filings required by other Antitrust Laws, (ii) comply, to the extent practicable, at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Body in respect of such filings or the Transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Body under any Antitrust Laws with respect to any such filing or any Transaction. Each such party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Transactions. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any Transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Sellers and Purchaser may, as each deems advisable and necessary in good faith, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Purchaser, as the case may be).

(b) Each of Purchaser and Sellers shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Transactions under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines

37

or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any Transaction is in violation of any Antitrust Law, each of Purchaser and Sellers shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Sellers decide that litigation is not in their respective best interests. Each of Purchaser and Sellers shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to the Transactions as promptly as possible after the execution of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Sellers agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable the parties to close the Transactions as expeditiously as possible.

8.5     Further Assurances. Subject to the other provisions of this Agreement, each of Purchaser and each Seller shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

8.6     Preservation of Records. Sellers or their successors and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Purchased Assets for one year after the Closing Date (except as provided below) and shall make such records available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Sellers or Purchaser or any of their Affiliates or in order to enable Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby. In the event Sellers or Purchaser wishes to destroy such records before or within two years, such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 90 day period, to take possession of the records within one-hundred and eighty (180) days after the date of such notice.

8.7     Publicity. None of the parties hereto shall issue any press release concerning this Agreement or the Transactions without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

38

8.8     Schedules and Exhibits. Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent on its face. Prior to Closing, Sellers shall update the Schedules to this Agreement as of the Closing Date, provided that no such update shall relieve Sellers for any breach, or deprive Purchaser of any remedy, based on the Schedules as originally provided.

8.9     Transitional License. Effective upon the Closing, Purchaser shall be deemed to have granted Sellers a one-hundred and eighty (180) day non-exclusive, royalty free right and license to use the name "Tweeter Home Entertainment", which may be used solely in connection with the wind-down of the Bankruptcy Case for purposes of selling or liquidating the Excluded Assets.

8.10    Compliance with DIP. Sellers shall not take any action not in compliance with any covenant or other agreements set forth in any DIP Credit Agreement.

8.11    Payment of Taxes. Sellers shall be responsible for paying or otherwise discharging all of its Taxes for all periods (or portions thereof) ending on or prior to the Closing Date.

8.12    Motions, Orders, etc. Sellers shall promptly provide Purchaser with the proposed final drafts of all documents, motions, orders, or pleadings that Sellers propose to file with the Bankruptcy Court which relate to the approval of this Agreement, the Purchased Assets, the Assumed Contracts or Assumed Leases or the consummation of the Transactions, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings prior to filing with the Bankruptcy Court.

8.13    Title Insurance; Surveys. As promptly as practicable hereafter, the Sellers shall provide the Purchaser with all title insurance commitments, policies and riders in the Sellers' possession with respect to each parcel of real property listed in Schedule 5.12(a). The Purchaser shall have the right to conduct title searches on each such parcel.

## ARTICLE IX
## EMPLOYEES AND EMPLOYEE BENEFITS

9.1     Transferred and Retained Employees.

(a)     The parties recognize that the continued employment of the personnel of Sellers is significant to the business interests of both Purchaser and Sellers. As a result, the orderly transfer of employment relationships is important to both parties and Sellers shall use their best efforts to accomplish the transition with as little disruption to the Business as possible.

39

Purchaser shall have the right (but not the obligation) to offer employment upon terms and conditions determined by Purchaser to substantially all of Sellers' operating Employees associated with the Business and presently intends to do so, and Purchaser may offer employment to any other Employee of the Sellers on terms and conditions that are generally comparable in the aggregate to those presently provided to such employees (each of the Sellers' employees that accepts such an offer and actually commences employment after the Closing Date, the "<u>Transferred Employees</u>", and all other employees of the Sellers not otherwise terminated prior to the Closing Date, the "<u>Retained Employees</u>").

(b)    For purposes of determining eligibility to participate in and vesting under any "employee benefit plan" (as defined in Section 3(3) of ERISA), other than pension plans (including any defined benefit pension plan), that Purchaser offers to Transferred Employees, and for purposes of determining vacation, sickness benefits and other fringe benefits offered to Transferred Employees by Purchaser, each such Transferred Employee shall be credited with the months and years of service he or she completed while employed by the Sellers for any other period or, to the extent such service was credited under a corresponding plan or program maintained by the Sellers.

(c)    Within ten (10) business days following the later of (i) the execution of this Agreement or (ii) the Purchaser's identification of all of the Transferred Employees, Sellers shall provide a list of the name and site of employment of any and all employees of Sellers who have experienced, or will experience, an employment loss or layoff – as defined by the Worker Adjustment and Retraining Notification Act of 1988 or any similar applicable state or local law requiring notice to employees in the event of a closing or layoff (the "<u>WARN Act</u>") as a result of the Transactions contemplated by this Agreement.

(d)    Sellers and Purchaser shall cooperate to comply with and take all actions necessary to minimize the obligations arising under the WARN Act in connection with any (i) plant closing as defined in the WARN Act affecting any site of employment or one or more facilities or operating units within any site of employment of Sellers; (ii) mass layoff as defined in the WARN Act affecting any site of employment of Sellers; or (iii) similar action under the WARN Act requiring notice to employees in the event of an employment loss or layoff. Sellers shall send such notices under the WARN Act as Purchaser may reasonably request or as may be reasonably required.

9.2    <u>Employment Tax Reporting</u>. With respect to Transferred Employees, Purchaser and Sellers shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment tax reporting.

9.3    <u>Compensation and Benefits</u>. Subject to its review of the current compensation and benefit arrangements of the Transferred Employees, Purchaser intends to either maintain the current compensation and benefit arrangements of the Transferred Employees or provide compensation and benefits to such employees that Purchaser determines in good faith are, in the aggregate, that are generally comparable to those presently provided to such employees. Subject to such review, for purposes of eligibility, vesting and the calculation of the amount of vacation, severance or other benefits under the employee benefit plans of Purchaser providing benefits to

40

Transferred Employees, Purchaser intends to credit each Transferred Employee with his or her years of service with Sellers to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan.

9.4 No Obligations. Nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of any Seller or any other persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1 Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of Sellers contained in this Agreement (i) that are not qualified by materiality or a Material Adverse Change shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Change and (ii) that are qualified by materiality or Material Adverse Change shall be true and correct in all respects on and as of the Closing (disregarding any materiality or Material Adverse Change qualifier contained therein, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Change, and Purchaser shall have received a certificate signed by authorized officers of Sellers, dated the Closing Date, to the foregoing effect;

(b) Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by authorized officers of Sellers, dated the Closing Date, to the forgoing effect;

(c) [INTENTIONALLY OMITTED]; and

(d) Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

41

10.2    Conditions Precedent to Obligations of Sellers. The obligations of Sellers to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Purchaser contained in this Agreement (i) that are not qualified by materiality shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a material adverse change and (ii) that are qualified by materiality shall be true and correct in all respects on and as of the Closing (disregarding any materiality qualifier contained therein), except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a material adverse change, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)    Purchaser shall have delivered to Sellers all of the items set forth in Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of Purchaser and Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    [INTENTIONALLY OMITTED];

(c)    the Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Sellers and Purchaser within two (2) Business Days of the Sale Hearing;

(d)    [INTENTIONALLY OMITTED];

(e)    the Sellers and the Purchaser shall have entered into the Transition Services Agreement; and

42

(f)     The Bidding Procedures Order shall have been entered and shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented in any material respect without the Purchaser's prior written consent.

10.4     Frustration of Closing Conditions.  No party may rely on the failure of any condition set forth in Sections 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## TAXES.

11.1     Allocation of Taxes.  All Taxes imposed on or with respect of the Purchased Assets on a periodic basis (including but not limited to real estate Taxes and assessments) ("Periodic Taxes") relating to periods beginning on or before and ending after the Closing Date shall be allocated on a per diem basis to the Sellers and the Purchaser, respectively, in accordance with Section 164(d) of the Code. All Periodic Taxes relating to periods ending on or before the Closing Date shall be allocated solely to the Sellers. All Periodic Taxes relating to the periods beginning after the Closing Date shall be allocated solely to the Purchaser. If the actual amounts to be prorated are not known as of the Closing Date, the prorations shall be made on the basis of Periodic Taxes assessed for the prior year; provided, however, for purposes of calculating such prorated amounts, such Periodic Taxes for the prior year shall be increased by five percent (5%).

11.2     Purchase Price Allocation.  Sellers and Purchaser shall allocate the Purchase Price among Sellers and among the Purchased Assets of each Seller in accordance with a statement (the "Allocation Statement") provided by Purchaser to Sellers as soon as practicable after the Closing, which statement shall be prepared in accordance with Section 1060 of the Code. The Purchase Price allocated to each Seller shall be comprised first of the Assumed Liabilities of each Seller and then a pro rata portion of each other item comprising the Purchase Price. Purchaser and Sellers shall file all Tax Returns (including Form 8594) consistent with, and shall take no tax position inconsistent with the Allocation Statement. Sellers and Purchaser shall consult with the Committee with respect to the allocation of the Purchase Price.

11.3     Tax Reporting.  Purchaser and Sellers shall each be responsible for the preparation and filing of their own Tax Returns.

11.4     Cooperation and Audits.  Purchaser and Sellers shall cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes. Without limiting the generality of the foregoing, Sellers shall execute on or prior to the Closing Date a power of attorney authorizing Purchaser to correspond, sign, collect, negotiate, settle and administer all tax payments and Tax Returns.

43

## ARTICLE XII

## MISCELLANEOUS

12.1 <u>No Survival of Representations and Warranties</u>. The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder and no Person shall have any liability for any breach thereof,. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

12.2 <u>Expenses</u>. Except as otherwise provided in this Agreement, each of Sellers and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions. Purchaser shall pay the filing fee required in connection with the HSR Act filing contemplated by <u>Section 8.4(a)</u>.

12.3 <u>Injunctive Relief</u>. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises or agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this <u>Section 12.3</u> shall be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

12.4 <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a) Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.8</u> hereof; <u>provided, however</u>, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

44

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.8.

12.5     Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.6     Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto) collectively represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.7     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

12.8     Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to the Sellers, to:

Tweeter Home Entertainment Inc.
 40 Pequot Way
Canton, MA 02021
Attn: Joseph Mcguire

with copies to:

Skadden, Arps, Slate, Meagher & Flom LLP

45

One Rodney Square
P.O. Box 636
Wilmington DE 19801
Attn: Gregg M. Galardi, Esq.
Tel: (302) 651-3000
Fax: (302) 651-3001

and

Goulston & Storrs
400 Atlantic Avenue
Boston, MA 02110-3333
Attn: Kit Sawitsky, Esq.
Tel: (617) 482-1776
Fax: (617) 574-4112


If to Purchaser, to:

c/o Schultze Asset Management, LLC
3000 Westchester Avenue
Purchase, New York 10577
Attn: George J. Schultze
Tel: (914) 701-5260
Fax: (914) 701-5269


With copies to:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Attn: Robert J. Moore, Esq.
Tel: (213) 892-4501
Fax: (213) 629-5063

and

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Attn: Neil J Wertlieb, Esq.
Tel: (213) 892-4410
Fax: (213) 892-4710

LA1:#6355374v9
07/13/07 12:10 PM

12.9     Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

12.10    Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided that Purchaser may assign some or all of its rights and obligations hereunder to one or more subsidiaries formed by it prior to the Closing and/or, upon notice to the Company, to one or more Persons that Purchaser determines, in its sole discretion, to partner with in connection with the Transactions. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Sellers or Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.11    Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

47

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

PURCHASER:

TWEETER NEWCO, LLC

By: _____

      Name:
      Title:

i

SELLERS:

Tweeter Home Entertainment Group, Inc.

By:_____

NEA Delaware, Inc.

By:_____

New England Audio Co., Inc.

By:_____

Sound Advice, Inc.

By:_____

Sound Advice of Arizona, Inc.\

By:_____

Hillcrest High Fidelity, Inc.

By:_____

Sumarc Electronics Incorporated

By:_____

Theg USA, L.P.

By:NEA Delaware, Inc.
Its: General Partner

ii

By:_____

LA1.#6355374v9
07/13/07 12:10 PM