# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................................... 2
    1.1    Certain Definitions........................................................................................... 2
    1.2    Terms Defined Elsewhere in this Agreement ................................................. 9
    1.3    Other Definitional and Interpretive Matters ............................................... 10
ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ........ 11
    2.1    Purchase and Sale of Assets.......................................................................... 11
    2.2    Excluded Assets ............................................................................................ 13
    2.3    Assumption of Liabilities.............................................................................. 15
    2.4    Excluded Liabilities ...................................................................................... 16
    2.5    Executory Contract Designation ................................................................... 16
    2.6    Assignment of Contracts and Rights.............................................................. 18
    2.7    Further Conveyances and Assumptions......................................................... 18
ARTICLE III CONSIDERATION ................................................................................... 18
    3.1    Purchase Price............................................................................................... 18
    3.2    Purchase Price Deposit ................................................................................. 19
ARTICLE IV CLOSING, INVENTORY TAKING AND TERMINATION ............................. 20
    4.1    Closing Date.................................................................................................. 20
    4.2    Deliveries by Sellers ..................................................................................... 20
    4.3    Deliveries by Purchaser ................................................................................ 21
    4.4    Termination of Agreement............................................................................. 21
    4.5    Procedure Upon Termination......................................................................... 22
    4.6    Effect of Termination..................................................................................... 23
    4.7    Inventory Taking for Post-Closing Purchase Price Adjustment. .................... 23
ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS............................... 23
    5.1    Organization and Good Standing................................................................... 24
    5.2    Authorization of Agreement.......................................................................... 24
    5.3    Conflicts; Consents of Third Parties.............................................................. 24
    5.4    Title to Purchased Assets .............................................................................. 25
    5.5    Taxes............................................................................................................. 25
    5.6    Intellectual Property...................................................................................... 25
    5.7    Permits ......................................................................................................... 25
    5.8    Environmental Matters................................................................................... 26
    5.9    Employee Benefits ........................................................................................ 26
    5.10   Litigation...................................................................................................... 27
    5.11   Material Contracts......................................................................................... 27
    5.12   Property........................................................................................................ 28
    5.13   Brokers......................................................................................................... 29
    5.14   No Other Representations or Warranties; Schedules...................................... 29
    5.15   Financial Statements ..................................................................................... 29
    5.16   Board Approval and Recommendation........................................................... 29

| | | |
|---|---|---:|
| 5.17 | Acknowledgment | 30 |

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** ... 30

| | | |
|---|---|---:|
| 6.1 | Organization and Good Standing | 30 |
| 6.2 | Authorization of Agreement | 30 |
| 6.3 | Conflicts; Consents of Third Parties | 30 |
| 6.4 | Brokers | 31 |
| 6.5 | Adequate Assurance | 31 |
| 6.6 | Condition of the Purchased Assets | 31 |
| 6.7 | Communications with Customers and Suppliers | 31 |

**ARTICLE VII BANKRUPTCY COURT MATTERS** ... 32

| | | |
|---|---|---:|
| 7.1 | Competing Transaction | 32 |
| 7.2 | Bidding Procedures Order | 32 |
| 7.3 | Submission to Bankruptcy Court | 33 |
| 7.4 | Break-Up Fee and Expense Reimbursement | 33 |
| 7.5 | Sale Order | 34 |

**ARTICLE VIII COVENANTS** ... 34

| | | |
|---|---|---:|
| 8.1 | Access to Information | 34 |
| 8.2 | Conduct Pending the Closing | 34 |
| 8.3 | Consents | 36 |
| 8.4 | Regulatory Approvals | 37 |
| 8.5 | Further Assurances | 38 |
| 8.6 | Preservation of Records | 38 |
| 8.7 | Publicity | 38 |
| 8.8 | Schedules and Exhibits | 39 |
| 8.9 | Transitional License | 39 |
| 8.10 | Compliance with DIP | 39 |
| 8.11 | Payment of Taxes | 39 |
| 8.12 | Motions, Orders, etc. | 39 |
| 8.13 | Title Insurance; Surveys | 39 |

**ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS** ... 39

| | | |
|---|---|---:|
| 9.1 | Transferred and Retained Employees | 39 |
| 9.2 | Employment Tax Reporting | 40 |
| 9.3 | Compensation and Benefits | 40 |
| 9.4 | No Obligations | 41 |

**ARTICLE X CONDITIONS TO CLOSING** ... 41

| | | |
|---|---|---:|
| 10.1 | Conditions Precedent to Obligations of Purchaser | 41 |
| 10.2 | Conditions Precedent to Obligations of Sellers | 42 |
| 10.3 | Conditions Precedent to Obligations of Purchaser and Sellers | 42 |
| 10.4 | Frustration of Closing Conditions | 43 |

**ARTICLE XI Taxes.** ... 43

| | | |
|---|---|---:|
| 11.1 | Allocation of Taxes | 43 |
| 11.2 | Purchase Price Allocation | 43 |
| 11.3 | Tax Reporting | 43 |
| 11.4 | Cooperation and Audits | 43 |

**ARTICLE XII MISCELLANEOUS** ... 44

| 12.1 | No Survival of Representations and Warranties | 44 |
|------|-----------------------------------------------|-----|
| 12.2 | Expenses | 44 |
| 12.3 | Injunctive Relief | 44 |
| 12.4 | Submission to Jurisdiction; Consent to Service of Process | 44 |
| 12.5 | Waiver of Right to Trial by Jury | 45 |
| 12.6 | Entire Agreement; Amendments and Waivers | 45 |
| 12.7 | Governing Law | 45 |
| 12.8 | Notices | 45 |
| 12.9 | Severability | 47 |
| 12.10 | Assignment | 47 |
| 12.11 | Counterparts | 47 |

iii

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TWEETER HOME | ) | Case No. 07-10787 (PJW) |
| ENTERTAINMENT GROUP, INC. | ) | |
| et al., [1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related Docket Nos. 111, 187, 211, 287, 300, |
| | ) | 302, 319 |

**ORDER (1) APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTORS'
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES; (2) APPROVING ASSUMPTION AND ASSIGNMENT OF
CERTAIN CONTRACTS AND LEASES; AND (3) GRANTING RELATED RELIEF**

This matter came before the Court on the "Debtors' Motion for Order

(I) Approving Procedures in Connection With Sale of All or Substantially All of the Business,

and (II) Authorizing the Debtors to Enter into Stalking Horse Agreements in Connection With

Going Concern, Store Closing and Miscellaneous Asset Sale, (III) Approving the Payment of

Termination Fee in Connection Therewith, and (IV) Setting Auction and Hearing Dates Pursuant

to Bankruptcy Code Sections 105 and 363 (the "Sale Motion"). Pursuant to the Sale Motion, the

above-captioned debtors and debtors in possession (collectively, the "Debtors") sought, *inter

alia*, (a) an order authorizing the sale of substantially all the assets (the "Sale") of the Debtors to

Tweeter Newco, LLC and/or its assignees ("Purchaser"), free and clear of all Liens, Claims,

Interests and Encumbrances (as such terms are defined in the Asset Purchase Agreement dated as

---

[1] The Debtors are the following entities: Tweeter Home Entertainment Group, Inc.; New England
Audio Co., Inc.; Sound Advice of Arizona, Inc.; NEA Delaware, Inc.; THEG USA, LP; Hillcrest High
Fidelity, Inc.; Sound Advice, Inc.; and Sumare Electronics Inc.

of June 26, 2007 (the "Purchase Agreement")[2] pursuant to Sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (the assets to be sold being more fully described in and collectively defined in the Purchase Agreement, and hereinafter referred to as the "Purchased Assets").

On June 26, 2007, the Court entered its "Order (I) Approving Procedures in Connection With Sale of All or Substantially All of the Business, and (II) Authorizing the Debtors to Enter into Stalking Horse Agreements in Connection With Going Concern, Store Closing and Miscellaneous Asset Sale, (III) Approving the Payment of Termination Fee in Connection Therewith, and (IV) Setting Auction and Hearing Dates Pursuant to Bankruptcy Code Sections 105 and 363" (the "Bid Procedures Order"), authorizing the Debtors to proceed with the sale procedures set forth therein and approving the Termination Fee (the "Bid Procedures") and the form of notice of the hearing on the Sale Motion.

The Court, having conducted a hearing on the Sale Motion on July 13, 2007 (the "Sale Hearing); and all parties in interest having been heard, or having had the opportunity to be heard, regarding approval of the Purchase Agreement, and the transactions contemplated thereby (the "Transactions"); and the Court having reviewed and considered the Sale Motion and objections thereto, and the arguments of counsel made, and the evidence adduced, at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases, and after due deliberation thereon, and good cause

---

[2]     A copy of the Purchase Agreement is attached hereto as Exhibit B. Except as otherwise noted in this Order, capitalized terms that are used but not defined in this Order have the meanings ascribed to such terms in the Purchase Agreement.

appearing therefore; **THE COURT HEREBY FINDS DETERMINES AND CONCLUDES THAT:**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

B.    The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C.    The statutory predicates for the relief requested in the Sale Motion are Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9014 and 9019.

D.    As evidenced by the affidavits of service filed with the Court, written notice of the Sale Hearing was transmitted to: (a) the Office of the United States Trustee; and (b) to (i) the creditors holding the largest claims in these Chapter 11 Cases; (ii) the persons known to the Debtors to possess and/or exercise any control over any of the Purchased Assets; (iii) the persons known to the Debtors to assert any rights in any of the Purchased Assets; (iv) all applicable federal, state and local tax authorities with jurisdiction over the Debtors and/or the Purchased Assets; (v) all federal, state and local environmental authorities in jurisdictions in which the Debtors operate and/or in which the Purchased Assets are located; (vi) any known

3

party that has expressed a bona fide interest in writing to the Debtors regarding any purchase of the Purchased Assets; (vii) counsel for the Official Committee of Unsecured Creditors ("Committee") and counsel for the Court approved post-petition lenders to the Debtors ("DIP Lenders"); and (viii) all entities that have requested notice in the Debtors' chapter 11 cases.

E.      Based upon the affidavits of service filed with the Court: (a) notice of the Sale Motion, the Bid Procedures, the Bid Procedures Order, the Sale Hearing and of the Debtors' intention to assume and assign Assumed Executory Contracts, was adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules; and (b) a reasonable opportunity to object and be heard with respect to the Sale Motion and the relief requested therein was afforded to all interested persons and entities.

F.      The Purchased Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

G.      The Bid Procedures were substantively and procedurally fair to all parties, were consented to by all parties in the chapter 11 cases, and were the result of intense arms length negotiations among the Debtors, the Committee, Purchaser and the DIP Lenders.

H.      The Debtors and their professionals marketed the Purchased Assets and conducted the sale process in accordance with the Bid Procedures. The Debtors provided notice of the sale of the Purchased Assets to Purchaser to each of the entities that previously expressed a bona fide interest in the Purchased Assets or the Business. Based upon the record of these proceedings, all creditors and equityholders, all other parties-in-interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

4

I.    After an auction held on July 10, 2007, the Debtors determined that the highest and best Qualified Bid was that of Purchaser.

J.    Subject to the entry of this Order, each Debtor (i) has full power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the sale of the Purchased Assets by the Debtors has been duly and validly authorized by all necessary company action of each of the Debtors, (ii) has all of the power and authority necessary to consummate the Transactions contemplated by the Purchase Agreement, (iii) has taken all company action necessary to authorize and approve the Purchase Agreement and the consummation by such Debtors of the Transactions. No consents or approvals, other than those expressly provided for in the Purchase Agreement or this Order, are required for the Debtors to Close the Sale and consummate the Transactions.

K.    The Debtors' decision to sell substantially all of their assets was based upon severe pre-petition liquidity constraints that only worsened post-petition. In the absence of Court approval of the Sale, the Debtors' chapter 11 cases ultimately would have been a free-fall chapter 11, and the Debtors would have been required to begin the piecemeal liquidation of the Debtors' assets and businesses, which piecemeal liquidation would result in less value for the Debtors' creditor constituencies than is provided pursuant to the Sale and the loss of several thousand jobs. Emergent circumstances and sound business reasons exist for the Debtors' Sale of the Purchased Assets and consummation of the Transactions pursuant to the Purchase Agreement and this Order.

L.    Entry into the Purchase Agreement and consummation of the Transactions constitute the exercise by the Debtors of sound business judgment and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that

the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to Purchaser. Such business reasons include, but are not limited to, the following: (i) the Purchase Agreement constitutes the highest and best offer for the Purchased Assets; (ii) the Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Purchased Assets on a going concern basis and avoid decline and devaluation of the Debtors' business; (iii) there is substantial risk of deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; and (iv) the Purchase Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available restructuring alternative.

M.     The Purchase Agreement and the Transactions were negotiated and have been and are undertaken by the Debtors and Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Section 363(m) and (n) of the Bankruptcy Code. An auction was conducted in accordance with the Bid Procedures Order on July 10, 2007, at which Purchaser was declared the highest and best bidder. The auction was conducted at arms' length and in good faith within the meaning of Section 363(m) of the Bankruptcy Code. As a result of the foregoing, the Debtors and Purchaser are entitled to the protections of Section 363(m) of the Bankruptcy Code. Moreover, neither the Debtors nor Purchaser engaged in any conduct that would cause or permit the Purchase Agreement, the consummation of the Transactions or the assumption and assignment of any Assumed Executory Contracts to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code.

N.     The Sale does not constitute a *sub rosa* chapter 11 plan.

O.     Purchaser, is a secured creditor of the Debtors, holding valid Liens, Claims, Interests and Encumbrances in, on and against the Debtors, their estates and property of

6

the estates, arising in connection with the Junior Secured Super-priority Debtor-in-Possession Credit Agreement, approved by this Court pursuant to an order entered on June 26, 2007 (the "Junior DIP Credit Agreement"). Purchaser held an allowed claim, as of date of the Auction in the amount of $10,118,448 and was authorized to credit bid any or all of such allowed claim at the Auction. At the Auction, Purchaser credit bid $10,118,448 (the "Credit Bid"), which Credit Bid was a valid and proper offer pursuant to the Bid Procedures and Bankruptcy Code Sections 363(b) and 363(k).

P.     The total consideration provided by Purchaser for the Purchased Assets is the highest and best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia ((a), (b) and (c) collectively, "Value"), for the Purchased Assets.

Q.     Purchaser would not have entered into the Purchase Agreement and would not consummate the Transactions, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Purchased Assets to Purchaser and the assignment of Assumed Executory Contracts to Purchaser was not free and clear of all Liens, Claims, Interests and Encumbrances, or if Purchaser would, or in the future could, be liable for any of such Liens, Claims, Interests and Encumbrances. A sale of the Purchased Assets other than one free and clear of Liens, Claims, Interests and Encumbrances would adversely impact the Debtors' estates, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale.

7

Therefore, the Sale contemplated by the Purchase Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

R.     The Debtors may sell the Purchased Assets free and clear of all Liens, Claims, Interests and Encumbrances, because, with respect to each creditor asserting a Lien, Claim or Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Liens, Claims, Interests and Encumbrances who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented to the Sale Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Liens, Claims, Interests and Encumbrances who did object fall within one or more of the other subsections of Bankruptcy Code Section 363(f).

S.     The Court has appointed a Consumer Privacy Ombudsman, who has filed a preliminary report. Subject to Purchaser's continued compliance with the Debtors' existing consumer privacy policies, and the Purchaser's agreement to confer with the Consumer Privacy Ombudsman with respect to the opt-out issues raised by the Consumer Privacy Ombudsman in his report, the Sale satisfies the requirements of Bankruptcy Code Section 363(b)(1).

T.     There was no evidence of insider influence or improper conduct by Purchaser or any of its affiliates in connection with the negotiation of the Purchase Agreement with the Debtors. There was also no evidence of fraud or collusion among Purchaser and its affiliates and any other bidders for the Debtors' assets, or collusion between the Debtors and Purchaser or its affiliates to the detriment of any other bidders. The Debtors established a due diligence room in which the information provided to Purchaser in connection with the negotiation of the Purchase Agreement was also provided to other potential bidders for the assets.

U.    At no time was Purchaser or its affiliates an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between Purchaser or its affiliates and any of the Debtors. Pursuant to the Purchase Agreement, Purchaser is not purchasing all of the Debtors' assets in that Purchaser is not purchasing any of the Excluded Assets, and Purchaser is not holding itself out to the public as a continuation of the Debtors. Those of the Debtors' employees who are to be employed by Purchaser pursuant to Article IX of the Purchase Agreement, are being hired under new employment contracts or other arrangements to be entered into or to become effective at or after the time of the Closing. The Transactions do not amount to a consolidation, merger or *de facto* merger of Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and Purchaser, Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and Purchaser does not constitute a successor to the Debtor or the Debtors' estates.

V.    Except as otherwise expressly provided in the Purchase Agreement, the transfer of the Purchased Assets to Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and will vest Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all Liens, Claims, Interests and Encumbrances, including but not limited to all Claims arising under doctrines of successor liability.

W.    Approval of the Purchase Agreement and assumption, assignment, and sale of each of the Assumed Executory Contracts, and consummation of the Sale of the Purchased Assets at this time are in the best interests of the Debtors, their creditors, their estates, and all parties in interest. Time is of the essence in consummating the Sale. In order to

maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Purchase Agreement. Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

X.      GE Money Bank (as successor to GE Capital Consumer Card Co.) ("GEMB") and Tweeter Home Entertainment Group, Inc. , are parties to the Amended and Restated Private Label Revolving Credit Plan Agreement, dated September 1, 2004 (the "GEMB Credit Card Agreement"). The Debtors, Purchaser and GEMB have agreed that Debtors shall assume the GEMB Credit Card Agreement and assign it to Purchaser, but only pursuant to the letter agreement between Purchaser and GEMB dated as of the date hereof (the "GEMB Letter Agreement"). Pursuant to the GEMB Letter Agreement, among other things, Purchaser has agreed to post a letter of credit or cash collateral in the amount of $2.2 million, to secure certain of its obligations under the assumed and assigned GEMB Credit Card Agreement. In connection with the Closing, (a) Purchaser, for its own benefit and on its own behalf, has agreed to deliver the cash collateral to GEMB, and (b) the Senior DIP Agent (defined below) has agreed to release the equivalent amount to the estate.

Y.      The Debtors' payment of the Termination Fee to Great American Group, LLC and Crystal Capital Fund Management, L.P. (together, the "GOB Stalking Horse") in the amount of $175,000 (the "GOB Termination Fee"), under the conditions set forth in the Motion, as amended, and the Bid Procedures Order, is (a) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (c) reasonable and appropriate and (d) necessary to ensure that the GOB Stalking Horse pursued its proposed

agreement to undertake the Store Closing Sales and is supported by the Debtors, the Committee and GECC.

Based upon all of the foregoing, and after due deliberation, **THE COURT ORDERS, ADJUDGES, AND DECREES THAT:**

1. The relief requested in the Sale Motion is granted in the manner and to the extent provided herein.

2. All objections and responses concerning the Sale Motion , other than adequate assurance, cure and any assumption and assignment issues in connection with Assumed Leases and/or Assumed Contracts, are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing; and to the extent any such objection or response was not otherwise withdrawn, waived or settled, it is, and all reservations of rights or relief requested therein, overruled and denied. None of the rights of the Debtors' landlords under Bankruptcy Code section 365 are being affected by this Order and all such rights are expressly preserved.

3. The Purchase Agreement, the Credit Bid, the Transactions, and the Sale of the Purchased Assets to Purchaser, are hereby approved and authorized in all respects.

4. Pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, upon the Closing Date, under the Purchase Agreement, the Purchased Assets, except any Assumed Leases, shall be transferred to Purchaser free and clear of (i) all Liens, Claims, Interests and Encumbrances, (ii) any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership of the Purchased Assets, and (iii) any Claim, whether arising prior to or subsequent to the commencement of these bankruptcy cases, arising under doctrines of successor liability.

5.     Except as expressly provided in the Purchase Agreement, Purchaser is not assuming nor shall it or any affiliate of Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the consummation of the transactions contemplated by the Purchase Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to the Closing Date, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against Purchaser or any affiliate of the Purchaser.

6.     The consideration provided by Purchaser for the Purchased Assets under the Purchase Agreement, including the portion of the consideration that consisted of the Credit Bid, is fair and reasonable and shall be deemed for all purposes to constitute Value under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under Section 363(n), or any other provision of the Bankruptcy Code.

7.     The Transactions are undertaken by Purchaser in good faith, Purchaser is a purchaser in good faith of the Purchased Assets as that term is used in Section 363(m) of the Bankruptcy Code, and Purchaser is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code; accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale of the Purchased Assets to Purchaser (including the assumption, assignment, and sale of Assumed Executory Contracts), unless such authorization is duly stayed pending such appeal.

8.	Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized and directed to take any and all actions necessary or appropriate to: (i) consummate the sale of the Purchased Assets to Purchaser (including, without limitation, to convey to Purchaser any and all of the Purchased Assets intended to be conveyed) and the Closing of the Transactions in accordance with the Sale Motion, the Purchase Agreement and this Order; and (ii) perform, consummate, implement and close fully the Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, including without limitation, take all actions and execute all documents reasonably necessary or appropriate to effectuate any obligations under the Purchase Agreement and to execute and deliver such other documents and take such other actions as are necessary to effectuate the transactions contemplated by the Purchase Agreement, including but not limited to obtaining any and all general liability insurance, director and officer insurance (but only after consultation with the Committee) and such other insurance as is appropriate. The parties shall have no obligation to proceed with the Closing of the Purchase Agreement until all conditions precedent to their obligations to do so as set forth in Article X thereof have been met, satisfied or waived.

9.	Purchaser is authorized to remit, or cause to be remitted, from the Purchase Price at Closing, in accordance with the terms of the payoff letters attached hereto as Exhibit A (the "Payoff Letters"): (a) to the agent under the Senior DIP Credit Agreement, for the benefit of the agent and the other lenders under the Senior DIP Credit Agreement, cash in the amount necessary to indefeasibly pay in full in cash all obligations owing to the agent and lenders under and in connection with the DIP Credit Agreement; (b) to the agent under the Junior DIP Credit Agreement, for the benefit of the agent and the other lenders under the Junior DIP

Credit Agreement, cash in the amount necessary to indefeasibly pay in full in cash all obligations owing to the agent and lenders under and in connection with the Junior DIP Credit Agreement, less the amount of the Credit Bid; and (c) to the Sellers, the remaining amounts due and payable as Purchase Price (the "Seller Proceeds"). From the Seller Proceeds, on or before July 20, 2007, Sellers shall fund (into segregated accounts) the following reserves in the amounts listed on Exhibit B attached hereto: the Professional Fee Reserve (which Professional Fee Reserve represents the funding by the Senior DIP Agent of the Carve Out under the Senior DIP Order, arising out of reserves established by the Senior DIP Agent since the Petition Date for the exclusive benefit of the estate's professionals, and shall not be used for any other purpose); the Utility Reserve; the reserve (the "Objecting Texas Tax Authorities Reserve") for the tax jurisdictions represented by the firm of McCreary, Veselka, Bragg & Allen, PC, the tax jurisdictions represented by the firm of Linebarger, Goggan, Blair & Sampson, LLP; the tax jurisdictions represented by the firm of Perdue, Brandon, Fielder, Collins & Mott, LLP; and the tax jurisdictions represented by the Law Offices of Robert E. Luna, PC; (collectively the "Objecting Texas Tax Authorities") in the total amount of $560,000; and the Polk Reserve.

      10. Upon the Closing, the remittance to the Debtors of the remaining Seller Proceeds shall constitute the complete and final release, discharge and satisfaction of the Senior DIP Agent's and the Junior DIP Agent's (both as defined in the Junior DIP Financing Order) respective obligations under the Senior DIP Financing Order, the Senior DIP Facility, the Junior DIP Order, and the Junior DIP Credit Agreement, and the Intercreditor Agreement (each as defined in the Junior DIP Financing Order). including, without limitation, any obligations with respect to the establishment of reserves listed in paragraph 9 above, subject, however, to the avoidance rights in Paragraph 7 of the Senior DIP Financing Order with respect to the Pre-

14

Petition Agent and Pre-Petition Credit Agreement Lenders (both as defined in the Senior DIP Financing Order).

11.    Upon the Closing or at such other times as provided in the Purchase Agreement, Purchaser is authorized to pay, perform and otherwise discharge the Assumed Liabilities pursuant to Section 2.3 of the Purchase Agreement.

12.    Purchaser is hereby authorized in connection with the consummation of the Sale to allocate the Purchased Assets among its affiliates, designees, assignees, and/or successors in a manner as it in its sole discretion deems appropriate and to assign, sublease, sublicense, transfer or otherwise dispose of any of the Purchased Assets to its affiliates, designees, assignees, and/or successors with all of the rights and protections accorded under this Order and the Purchase Agreement, and the Debtors shall cooperate with and take all actions reasonably requested by Purchaser to effectuate any of the foregoing.

13.    The Purchase Agreement contains the Debtors' agreement not to bring Avoidance Actions with respect to any payment that would constitute a Cure Cost under an Assumed Contract, and such agreement (a) shall be binding upon all creditors and equity holders of the Debtors, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, and (b) shall operate to bar, enjoin and estop any such persons and entities from commencing any such Avoidance Actions.

14.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the Transactions. No brokers were involved in consummating

the Sale or the Transactions, and no brokers' commissions are due to any person or entity in connection with the Sale or the Transactions.

15. Upon the Closing, (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Purchased Assets to Purchaser free and clear of any and all Liens, Claims, Interests and Encumbrances, and (b) except as otherwise expressly provided in the Purchase Agreement, all such Liens, Claims, Interests and Encumbrances shall be and hereby are released, terminated and discharged as to the Purchaser and the Purchased Assets.

16. Upon the Closing, and except as otherwise expressly provided in the Purchase Agreement, Purchaser shall not be liable for any Claims against, and liabilities and obligations of, the Debtors or any of the Debtors' predecessors or affiliates. Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement, (a) Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or make any other payment to employees of the Debtors, (b) Purchaser, shall have no liability or obligation in respect of any collective bargaining agreement, employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), (c) Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, (d) and all parties to any such employee benefit, agreement, plan or

16

program are enjoined from asserting against Purchaser any Claims arising from or relating to such employee benefit, agreement, plan or program.

17.     Purchaser shall not be deemed a successor of or to the Debtors or the Debtors' estates with respect to any Liens, Claims, Interests and Encumbrances against the Debtors or the Purchased Assets, and Purchaser shall not be liable in any way for any such Liens, Claims, Interests and Encumbrances, including, without limitation, the Excluded Liabilities, Excluded Environmental Liabilities or Excluded Assets. Upon the Closing of the Sale, all creditors, employees and equityholders of the Debtors are permanently and forever barred, restrained and enjoined from (a) asserting any Claims or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against Purchaser or the Purchased Assets on account of any of the Liens, Claims, Interests and Encumbrances, Excluded Liabilities, Excluded Environmental Liabilities or Excluded Assets, or (b) asserting any Claims or enforcing remedies under any theory of successor liability, *de facto* merger, or substantial continuity.

18.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to Purchaser on the Closing Date pursuant to the terms of the Purchase Agreement.

19.     This Order (a) is and shall be effective as a determination that, upon Closing, all Liens, Interests and Encumbrances existing as to the Purchased Assets conveyed to Purchaser have been and hereby are adjudged and declared to be unconditionally released, discharged and terminated, and (b) is and shall be binding upon and govern the acts of all entities, including, all filing agents, filing officers, title agents, title companies, recorders of

17

mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets conveyed to Purchaser. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Liens, Interests and Encumbrances against the Purchased Assets from their records, official and otherwise and including without limitation those Liens, Interests and Encumbrances listed in the applicable schedules to the Purchase Agreement.

20. If any person or entity, which has filed statements or other documents or agreements evidencing Liens, Interests and Encumbrances on or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens, Interests and Encumbrances, and any other documents necessary for the purpose of documenting the release of all Liens, Interests and Encumbrances which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and Purchasers are hereby authorized and directed, subject to the provisions of the Payoff Letters, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

21. Each and every federal, state and governmental agency or department, and any other person or entity, is hereby directed to accept any and all documents and instruments

necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

22.     Except as otherwise provided in the Purchase Agreement, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any former vendor, supplier or employee of the Debtors shall be transferred to Purchaser free and clear of Liens, Claims, Interests and Encumbrances and shall be delivered at the time of Closing to Purchaser.

23.     This Order and the Purchase Agreement shall be binding in all respects upon all creditors and equityholders of any of the Debtors, all non-debtor parties to the Assumed Executory Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, and the Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.

24.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified amended, or supplemented by the parties thereto, in a writing signed by the parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

25.     Any amounts that become payable by the Debtors to Purchaser pursuant to the Purchase Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Purchase Agreement shall (a) constitute administrative expenses of the

Debtors' estates and (b) be paid by the Debtors in the time and manner as provided in the Purchase Agreement without further order of this Court.

26. The assumption and assignment of the GEMB Agreement to Purchaser is hereby authorized and approved, pursuant to the terms of the GEMB Letter Agreement. Purchaser is directed to deliver to GEMB $2.2 million of cash collateral at Closing, and the Senior DIP Agent is directed to deliver the equivalent sum to the estate at Closing. Upon receipt by GEMB of the $2.2 million of cash collateral from Purchaser, the GEMB Letter Agreement shall be effective. Upon the Closing, the Challenge Period Termination Date, as defined in paragraph 7 of this Court's Final Order (1) Approving Post-Petition Financing, (2) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (3) Granting Liens and Providing Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 363 and 364 and (4) Modifying Automatic Stay Pursuant to 11 U.S.C. § 362 (the "Senior DIP Financing Order"), has occurred for all purposes with respect to any and all alleged claims of the estates against GEMB.

27. Subject to the provisions of paragraph 10 hereof, nothing contained in this Order or the Purchase Agreement shall: (a) abrogate or otherwise prejudice the rights of the parties under that Stipulation in Resolution of Limited Objection to Sale Procedures and Authorizing Debtors to Use Consigned Products and Cash Collateral of Polk Audio, Inc. and Granting Adequate Protection to Polk Audio, Inc. and this Court's Order Approving Stipulation in Resolution of Limited Objection to Sale Procedures and Authorizing Debtors to Use Consigned Products and Cash Collateral of Polk Audio, Inc. and Granting Adequate Protection to Polk Audio, Inc. (Docket No. 248) (the "Polk Stipulation"); or (b) require the filing by Polk Audio, Inc. of any additional financing statements or similar notices in order to protect and maintain its rights in existence prior to the entry of this Order. Moreover, the Polk Stipulation,

20

shall remain in full force and effect, valid and binding, and shall, in addition, be deemed to be in full force and effect, valid and binding with respect to the Purchaser as if the Purchaser was Tweeter (as this term is defined in the Polk Stipulation), from and after the Closing Date until the Consigned Agreement (as this term is defined in the Polk Stipulation) is either (a) assumed and assigned, or (b) rejected. Polk's Lien (as this term is defined in the Polk Stipulation) on all Consigned Products (as this term is defined in the Polk Stipulation) and all proceeds of the sale of Consigned Products shall, at all times, continue to be valid, properly perfected, first priority and unavoidable

28. The Debtors are hereby authorized and directed to pay to the GOB Stalking Horse the GOB Termination Fee and shall wire transfer said funds to the account of the GOB Stalking Horse pursuant to wire transfer instructions previously provided to the Debtors within two business days of the entry of the Closing.

29. Purchaser is directed to abide by the Debtors' existing privacy policies with respect to personally identifiable information as that term is used in Bankruptcy Code Section 363(b)(1), and this Court shall retain jurisdiction over Purchaser's further compliance with the requirements of such Section 363(b)(1).

30. Nothing contained in any order entered in the Debtors' bankruptcy cases subsequent to entry of this Order, nor in any chapter 11 plan confirmed in these chapter 11 cases, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

31. Notwithstanding any language to the contrary in this Order or the Purchase Agreement, including but not limited to the definition of Excluded Environmental Liabilities in the Purchase Agreement, nothing in this Order or the Purchase Agreement releases,

nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations that any entity would be subject to based on its status as the owner or operator of property owned or operated by that entity after the date of entry of this Order, provided that nothing herein shall be deemed to limit or abrogate defenses to such liability that any entity may have under environmental laws or regulations.

32. This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h), 6006(d) and any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted.

33. The provisions of this Order are nonseverable and mutually dependent.

34. To the extent applicable, the automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (i) to allow Purchaser to give the Debtors any notice provided for in the Purchase Agreement, and (ii) to allow Purchaser to take any and all actions permitted by the Purchase Agreement or the Ancillary Documents.

35. To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any Permit relating to the operation of the Purchased Assets sold, transferred or conveyed to Purchaser on account of the filing or pendency of these Chapter 11 cases or the consummation of the Sale.

36. Each and every federal, state and local government agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transfer of any of the Purchased Assets.

37. The failure specifically to include or make reference to any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness

of such provision, it being the intent of the Court that the Purchase Agreement is authorized and approved in its entirety.

38. The Court retains jurisdiction, even after the closing of these chapter 11 cases, to: (1) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Purchase Agreement, all amendments thereto and any waivers and consents thereunder; (2) protect Purchaser, or any of the Purchased Assets, from and against any of the Liens, Claims, Interests and Encumbrances; (3) compel delivery of all Purchased Assets to Purchaser; and (4) resolve any disputes arising under or related to the Purchase Agreement, the Sale or the Transactions, or Purchaser's peaceful use and enjoyment of the Purchased Assets.

39. The liens of the Objecting Texas Tax Authorities shall attach to the segregated proceeds in the Objecting Texas Tax Authorities Reserve with the same validity, in the amount and with the same priority as and to the same extent that they exist on the property being sold in this sale. The amounts in the segregated account shall constitute adequate protection for the sale of the Objecting Texas Tax Authorities' collateral. No distribution shall be made from the segregated account absent consent of the Debtors and the Objecting Texas Tax Authorities, or by order of the Court, upon subsequent hearing appropriately noticed to the Objecting Texas Tax Authorities. However, upon agreement of the Debtors and the Objecting Texas Tax Authorities as to the amount of any given claim, the Debtors may disburse payment to those Objecting Texas Tax Authorities in satisfaction of that claim.

40. With respect to JBL Audio, Inc., nothing in this Order shall affect the priority or status of the claims that JBL Audio, Inc., may have against the Debtors. To the extent that such claims were secured as of the Petition Date, such claims shall remain secured. To the

extent that such claims were not properly perfected and/or secured as of the Petition Date, nothing in this order shall be deemed to grant secured status to such claims. Moreover, nothing herein shall bee deemed to waive the rights of any parties in interest with respect to such claims.

41.     All amounts for (i) fees for hours worked by the Consumer Privacy Ombudsman after the Closing Date and (ii) expenses incurred by the Consumer Privacy Ombudsman after the Closing Date shall be reimbursed to the Debtors' estates or paid directly by the Purchaser.

Dated: July 13, 2007
Wilmington, Delaware

_____
**THE HONORABLE PETER J. WALSH,**
**UNITED STATES BANKRUPTCY JUDGE**

**EXHIBIT B**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (the "Agreement") is made and entered into this ___ day of July, 2007, by and among Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Home Entertainment Group, Inc., a Delaware corporation ("Tweeter"), a debtor and debtor in Possession under Case No. 07-10787 (PJW) (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware, having their principal executive offices located at 40 Pequot Way, Canton, MA 02021 (the "Canton Office"), and those direct and indirect subsidiaries of Tweeter that are signatories hereto (collectively with Tweeter, the "Sellers").

## RECITALS

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of June 26, 2007, by and among Tweeter Newco, LLC (the "Purchaser") and the Sellers, as amended through the date hereof (the "Asset Purchase Agreement"), Purchaser has, among other things, the right to acquire the Purchased Assets and the obligation to assume the Assumed Liabilities and advance or reimburse the Sellers for certain expenses; and

WHEREAS, Purchaser has assigned certain of its rights under the Asset Purchase Agreement to Tweeter Opco and certain of its other direct and indirect subsidiaries (Tweeter Opco, together with any such other subsidiaries, the "New Tweeter Entities") and the New Tweeter Entities will acquire the Business and the Purchased Assets at the Closing; and

WHEREAS, following the Closing of the sale transaction contemplated by the Asset Purchase Agreement (the "Sale Transaction"), Purchaser and its subsidiaries will require, and Sellers have agreed to provide, certain services and Sellers have agreed to take or not to take certain actions with respect to various Contracts and Leases in order to assist Purchaser and its subsidiaries with their acquisition of the Business and the Purchased Assets, their assumption of the Assumed Liabilities, and the exercise of Purchaser's rights pursuant to Section 2.5 of the Asset Purchase Agreement; and

WHEREAS, pursuant to the terms of the Asset Purchase Agreement and in connection with the consummation of the transactions contemplated thereby, Purchaser has agreed to make, or cause the New Tweeter Entities to make, offers of employment to certain of the Sellers' Employees associated with the Purchased Assets and the surviving Business related thereto, all of whose services are to be provided on an interim basis pursuant to this Agreement (the "Leased Employees").

WHEREAS, Sellers have agreed that the New Tweeter Entities may utilize the services of the Leased Employees on an interim basis in conducting the operation of the Business, all in accordance with the terms of this Agreement; and

WHEREAS, following the Closing of the Sale Transactions, the Sellers will be (i) developing, filing and implementing a liquidating plan of reorganization, (ii) taking steps to wind down the affairs of the Sellers, (iii) managing and winding down certain employee benefit

1

plans and other employee arrangements, (iv) preparing and filing certain tax returns and (v) completing other related activities (collectively, the "Tweeter Wind Down"), and Purchaser has agreed to provide, or cause the New Tweeter Entities to provide, Sellers and any successor entities to Sellers in the Bankruptcy Cases with certain assistance to complete the Tweeter Wind Down; and

**WHEREAS**, the Leased Employees will not become employees of the New Tweeter Entities, if at all, until some time after the Closing of the transactions contemplated by the Asset Purchase Agreement; and

**WHEREAS**, in order that the New Tweeter Entities may utilize the services of the Leased Employees in conducting the operation of the Business from and after the Closing until the Leased Employees become employees of the New Tweeter Entities, the New Tweeter Entities desire to retain, and Sellers desire to provide, the temporary services of the Leased Employees.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Tweeter Opco and the Sellers hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS; TERM

1.1     Defined Terms. All capitalized terms appearing in this Agreement and not otherwise defined shall have the definition or meaning ascribed to such terms in the Asset Purchase Agreement.

1.2     Term. The term of this Agreement (the "Term") shall commence on the Closing Date (the "Term Commencement Date"), and shall end on the closing of the Bankruptcy Cases or such other date as the parties may agree in writing.

## ARTICLE 2
## LEASED EMPLOYEES

2.1     Staffing. From the date hereof until such date as the Leased Employees should become employees of the New Tweeter Entities (the "Leasing Term"), which date shall be no later than six (6) months from the Closing Date, unless mutually agreed to in writing by the parties, Sellers shall supply the services of the Leased Employees to the New Tweeter Entities; *provided, however*, that any Leased Employee that is duly discharged by Sellers pursuant to this Section 2.1 or that is identified by Purchaser or Tweeter Opco in any Termination Notice (as hereinafter defined) delivered pursuant to Section 2.4 below shall cease to be considered a "Leased Employee" for all purposes of this Agreement as of the Effective Termination Date (as hereinafter defined) specified in such Termination Notice. During the Leasing Term, the Leased Employees shall remain the common law employees of Sellers, but Sellers shall not discharge any such Leased Employee during the Leasing Term other than for

2

cause as reasonably determined by Tweeter or with the written consent of Purchaser or Tweeter Opco. To the extent Purchaser exercises its right to transfer employment services from Sellers to the New Tweeter Entities pursuant to Section 9.1(a) of the Asset Purchase Agreement, Tweeter Opco and Sellers shall act in good faith to transition the Leased Employees to the payroll and benefit plans of Tweeter Opco as soon as reasonably practicable. During the Leasing Term, the Leased Employees shall remain participants in all of Sellers' existing employee benefit plans, as may be amended from time to time with the prior written consent of Purchaser or Tweeter Opco.

2.2     Withholding and Deduction. Consistent with Sellers' past practices, Sellers shall be responsible for (a) the payment or deduction from the compensation and benefits of the Leased Employees, as the case may be, and remittance to the appropriate governmental entities, of such sums as may be required to be paid by an employer or deducted or withheld from the Leased Employees' compensation and benefits and (b) the compliance with employee-related reporting, filing and disclosure obligations. Tweeter Opco shall promptly reimburse Sellers for all costs and expenses actually paid by the Sellers in connection with this section 2.2 after the Closing Date.

2.3     Reimbursement. In consideration of Sellers' supplying the services of the Leased Employees, Tweeter Opco shall reimburse Sellers for all actual out-of-pocket costs of employing the Leased Employees, including, but not limited to, the Leased Employees' compensation, employment taxes (including, but not limited to, social security, unemployment and income tax), employee benefits (including 401K contributions and any payments owed to third parties in connection with the 401K Plan, vacation, severance and holiday pay), workers compensation, and approved travel and business expense costs as well as any benefits, statutory or otherwise, earned, incurred or accrued by the Leased Employees during the Leasing Term in accordance with Sellers' existing employee benefit plans; provided, however, that none of the New Tweeter Entities shall be responsible for any such reimbursement under this Section 2.3 for such costs of employment of the Leased Employees incurred or accrued prior to the commencement of the Leasing Term, except to the extent set forth in this Agreement or in the Asset Purchase Agreement. Tweeter shall provide Tweeter Opco with reasonable advance notice of the amount of any reimbursement required hereunder, and Tweeter Opco, no later than two (2) business days prior to the date on which such payments are due to be paid, shall deposit into Sellers' payroll account, as directed by Tweeter, all payments required pursuant to this Article 2.

2.4     Relationship Among Sellers, Tweeter Opco and Leased Employees. On or prior to the Closing Date, Sellers shall inform the Leased Employees that their job duties shall consist of performing services as reasonably directed by Tweeter Opco. During the Leasing Term, Tweeter Opco shall have the sole right to direct and control the performance of the Leased Employees' services to the New Tweeter Entities, and the Leased Employees shall be assigned such positions, titles, roles and functions as determined by Tweeter Opco in its discretion. During the Leasing Term, the Leased Employees shall remain full-time employees exclusively of Sellers on loan to the New Tweeter Entities, and nothing herein shall be construed as creating a relationship of employer and employee between the New Tweeter Entities and any Leased Employee during the Leasing Term. Notwithstanding any other provision of this Agreement to the contrary, Tweeter Opco may terminate this Agreement with respect to any Leased Employee by delivery to Tweeter of a written notice (a "Termination Notice") identifying the Leased

3

Employee for whom this Agreement shall be terminated (the "Terminated Employee"), which notice shall be given in sufficient time to allow compliance with applicable law governing such termination. Upon receipt of a Termination Notice, Sellers shall take such actions as are required to terminate the Leased Employee identified in such Termination Notice as soon as is lawfully possible, but in no event less than two weeks after receipt of the Termination Notice (such date being the "Effective Termination Date"). On the Effective Termination Date, such Leased Employee shall cease to be considered a "Leased Employee" for all purposes under this Agreement. No New Tweeter Entity shall be obligated to pay or reimburse any Seller for the costs of any severance or similar payments except as expressly provided in this Agreement or in the Asset Purchase Agreement. Nothing herein shall be deemed to decrease the liabilities assumed by the Purchaser pursuant to the Asset Purchase Agreement.

## ARTICLE 3
## POST CLOSING MATTERS

3.1     Chief Liquidation Officer. Tweeter Opco hereby specifically agrees to provide the person to be designated by Tweeter and any successor administrator or trustee of the Sellers (the "Chief Liquidation Officer") with reasonable access to and use of office space (including conference rooms), furniture, equipment at the Canton Office and services and systems that are reasonably necessary to conduct the Tweeter Wind Down.

3.2     Grant of Premises. From the Closing Date through the end of the Term of this Agreement, Sellers and Tweeter Opco each agree to permit the other, and their respective directors, officers (including any Chief Liquidation Officer), employees and agents (the "Tweeter Representatives" or the "Purchaser Representatives", respectively) to use and be granted full and complete access to all of the others premises, stores or properties as may be reasonably necessary to operate the Business and acquire the Purchased Assets or conduct the Tweeter Wind Down.

3.3     Canton Office. Sellers and Tweeter Opco hereby agree to use commercially reasonable efforts to provide the Tweeter Representatives with access to and use of the Canton Office and such furniture and equipment as may be reasonably necessary to conduct the Tweeter Wind Down from the date hereof through the earlier of (i) the date on which the lease with respect to Canton Office is rejected or (ii) the end of the Term.

3.4     Tweeter Wind Down Services. After the Leasing Term and for the remainder of the Term of this Agreement, Tweeter Opco shall use commercially reasonable efforts to make Transferred Employees available to provide to the Chief Liquidation Officer those services required to complete the Tweeter Wind Down, but only as and to the extent reasonably requested by such Chief Liquidation Officer or a Tweeter Representative, and only to the extent it does not impose an unreasonable burden on the New Tweeter Entities.

3.5     Tweeter Wind Down Services Costs. Tweeter Opco shall provide the Tweeter Wind Down Services in Section 3.4 at no cost to Sellers.

3.6     Excluded Assets. During the Term of this Agreement, each Seller shall afford to the employees, officers, accountants, counsel, lenders, consultants and other

4

representatives of Tweeter Opco, reasonable access to the books and records pertaining to any Excluded Asset. Tweeter Opco, however, shall not be entitled to access to any materials containing privileged communications arising after the Closing or information about Leased Employees who are not Transferred Employees, disclosure of which might violate an employee's reasonable expectation of privacy.

3.7    Access to Services and Systems.  Sellers and Tweeter Opco hereby agrees to use commercially reasonable efforts to provide the Chief Liquidation Officer and any other Tweeter Representatives, from the date hereof through the end of the Term, with reasonable access to and use of all of Tweeter Opco's administrative services and products, including, but not limited to all books and records, accounting (including with respect to collection of accounts receivable), data processing, cash management, information technology, lease administration, inventory management, payroll systems, mailroom facilities, telephone systems and computer systems ("Services and Systems"), for the purpose of, and as is reasonably necessary to effect, the Tweeter Wind Down or the transition of the Business, the Purchased Assets and the Transferred Employees to the New Tweeter Entities, as applicable, in each case, as coordinated through the Chief Liquidation Officer and a Purchaser Representative.

3.8    Collection of Accounts Receivable.  During the Term of this Agreement, Tweeter Opco and Sellers shall use commercially reasonable efforts to collect all accounts receivable on the books and records of Sellers on the Closing Date on behalf and for the benefit of each of the Sellers and Tweeter Opco, consistent with ordinary course of business and to be distributed as required by the terms of the Asset Purchase Agreement; provided, however, that neither Tweeter Opco nor Seller shall be required to resort to litigation, arbitration or other extraordinary collection efforts in connection with the collection of an account receivable that is the property of the other under the Asset Purchase Agreement.  Neither Tweeter Opco nor Seller shall compromise nor otherwise agree to a reduction in the face amount of any accounts receivable that is the property of the other party without the prior consent of the party that owns such account receivable.  The Sellers and Tweeter Opco shall cooperate in good faith to reconcile the collection of the accounts receivable and to distribute or credit the proceeds in accordance with the terms of the Asset Purchase Agreement.

3.9    Advisors.  Subject to Section 8.11 of the Asset Purchase Agreement, Tweeter Opco and Seller shall cooperate in good faith with each other's tax advisors, accountants and auditors to prepare any tax filings, requests for refunds or pursue any other tax matters and administration of ERISA matters.

3.10    Bankruptcy Cases.  Tweeter Opco agrees to use commercially reasonable efforts to cooperate with the Chief Liquidation Officer and any Tweeter Representative and to instruct any Leased Employee or Transferred Employees to cooperate with the Chief Liquidation Officer and any Tweeter Representative in connection with any proceedings before the Bankruptcy Court relating to the Bankruptcy Cases, including, but not limited to, testifying before the Bankruptcy Court.  Tweeter agrees to pay all travel and related out of pocket expenses incurred by any Leased Employee or Transferred Employee in connection with the foregoing.

3.11    Availability of Chief Liquidation Officer.  Sellers agree to provide Tweeter Opco access to the Chief Liquidation Officer and shall use commercially reasonable

5

efforts to cause the Chief Liquidation Officer to cooperate with Tweeter Opco in the Business.

3.12     Minimum Disruption.  Seller and Tweeter Opco each agree to use commercially reasonable efforts to minimize disruptions (i) to Tweeter Opco's Business and (ii) to the Tweeter Wind Down, respectively, in connection with any of the services provided in this Agreement.

3.13     Limitation on Liability.  Each party shall not bring any cause of action against the other party (including any employees or agents of such other party) for any loss, damage, liability, cost or expense resulting from services provided by such other party or otherwise in connection with the performance of its obligations by such other party under this Agreement, unless such loss, damage, liability, cost or expense resulted from either (a) a breach of the provisions of this Agreement or (b) the negligence, willful misconduct or fraud of such other party in providing services pursuant to this Agreement; provided, however, that this Section 3.13 shall not restrict any party from enforcing any other rights or bringing any cause of action not directly related to the provision of services under this Agreement, including with respect to the Asset Purchase Agreement, the DIP Credit Agreement, the DIP facility provided by an Affiliate of Tweeter Opco or any document, agreement or instrument related thereto or delivered in connection therewith.  Notwithstanding the foregoing, it is expressly understood by the parties to this Agreement that the Leased Employees are expected to be acting at the direction and for the sole benefit of the New Tweeter Entities, and, as between Tweeter Opco and the Sellers, Tweeter Opco and not Sellers shall be solely responsible for all losses, damages, liabilities, costs and expenses resulting from the actions taken by the Leased Employees in the performance of their duties in accordance with the terms of this Agreement to the same extent as if Tweeter Opco and not Sellers were the employer of the Leased Employees

3.14     Insurance.  At the cost and expense of the Tweeter Opco, Sellers shall maintain insurance covering all risks for which insurance is currently maintained, including but not limited to fiduciary/employment practices and directors & officers insurance, and shall promptly take all commercially reasonable efforts to (a) extend such existing insurance coverage to a date not earlier than December 31, 2007 and (b) name the New Tweeter Entities as additional insureds thereunder.

## ARTICLE 4
## TERMINATION; FORCE MAJEURE

4.1     Breach.  Tweeter Opco or Tweeter may terminate this Agreement if the other party has materially breached any term of this Agreement and such other party has not cured such breach within ten (10) days after receipt of written notice of such breach.

4.2     Force Majeure.  Tweeter Opco may terminate this Agreement immediately if Sellers shall have been prevented or restricted from performing hereunder for a period of ten (10) consecutive business days by reason of Force Majeure.  "Force Majeure" for purposes of this Agreement shall be deemed to occur if a party is prevented from performing any obligation under this Agreement by reason of fire, explosion, casualty or accident resulting in war, revolution, acts of terrorism, civil commotion, acts of public enemies, blockade, or embargo, or any other event beyond the reasonable control of any party.  Upon the giving of prompt notice by

the party that is unable to perform due to Force Majeure, such party shall be excused from such performance to the extent of such prevention. The other party shall likewise be excused from performance of its obligations to the extent such obligations are related to the performance so prevented; provided, however, that the party unable to perform due to Force Majeure shall use all commercially reasonable efforts to avoid and to remove such causes of non-performance and both parties shall continue performance hereunder with the utmost dispatch whenever such causes are removed.

     4.3    Effects of Termination. Upon any termination of this Agreement, the right of a party to bring any cause of action against any other party based upon the duties, responsibilities and obligations specified in this Agreement shall survive termination of this Agreement for a period of six (6) months.

### ARTICLE 5
### MISCELLANEOUS

     5.1    Assignability; Parties in Interest.

     (a)    Each of Tweeter and Tweeter Opco may assign any or all of their respective rights, duties, obligations or undertakings hereunder to any of its affiliates or any of its direct or indirect subsidiaries or any successor in a transfer of all or substantially all of the assets of such party and shall advise the other party hereto of any such assignment and shall designate the assignee and transferee. Any such assignee shall be a party which the party not then proposing to transfer or assign its interest under this Agreement reasonably determines has the financial and operational capability of performing the assignor's obligations hereunder and such assignee shall assume in writing all duties, obligations and undertakings of its assignor hereunder, but the assignor shall remain fully liable under this Agreement notwithstanding any such assignment. In the event of the consummation of such a transfer to a third party of all or substantially all of the assets of a party, the other party shall have the right to terminate this Agreement on ten (10) days' written notice if the transferee does not provide assurances (reasonably satisfactory in form and content to the non-assigning party) of its financial and operational capability to perform hereunder.

     (b)    All the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective successors, assigns and legal representatives of the parties hereto.

     5.2    Entire Agreement; Amendments. This Agreement, including any schedules attached hereto (which form a part hereof), contain the entire understanding of the parties with respect to the subject matter hereof. This Agreement may be amended only by a written instrument duly executed by Tweeter on behalf of Sellers and by Tweeter Opco or their respective successors, assigns or legal representatives. Any condition to a party's obligations hereunder may be waived, but only by a written instrument signed by the party entitled to the benefits thereof. The failure or delay of any party at any time or times to require performance of any provision or to exercise its rights with respect to any provision hereof, shall in no manner operate as a waiver of or affect such party's right at a later time to enforce the same.

7

5.3     Relationship. Nothing in this Agreement shall be construed to constitute Tweeter Opco and any Seller as a partner, joint venturer, agent or representative of the other. Tweeter Opco on the one hand and Sellers on the other hand are independent companies retaining complete control over and complete responsibility for their respective operations and employees. Nothing in this Agreement shall be construed to grant to either party any right or authority to assume or create any obligations on behalf or in the name of the other, to accept summons or legal process for the other or to bind the other in any manner whatsoever.

5.4     Confidentiality. Tweeter Opco and Sellers agree and acknowledge that financial and other information relating to the other party to which it may have access under this Agreement is confidential business information. Tweeter Opco and Sellers shall take reasonable actions to maintain the confidentiality of such information and will not disclose it to third parties except as required by law or required in the ordinary course of business. Upon termination of this Agreement, each party shall, upon request of the other, deliver to the other any such business information under its control and all copies thereof.

5.5     Effect on Asset Purchase Agreement. Nothing in this Agreement shall affect Purchaser's or Sellers' rights under the Asset Purchase Agreement following the Closing Date, which rights shall remain in full force and effect as stated in the Asset Purchase Agreement.

5.6     Headings. The section and paragraph captions contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretations of this Agreement.

5.7     Severability. The invalidity of any term or terms of this Agreement shall not effect any other term of this Agreement which shall remain in full force and effect.

5.8     Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed (registered or certified mail, postage prepaid, return receipt requested) or if sent by telecopy as follows:

If to any Seller:

Tweeter Home Entertainment Group, Inc.
40 Pequot Way
Canton, MA 02021
Attn: Gregory W. Hunt
Tel: (781) 830-3000
Fax: (781) 830-3515

with copies to:

8

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington DE 19801
Attn: Gregg M. Galardi, Esq.
Tel: (302) 651-3000
Fax: (302) 651-3001

If to Tweeter Opco, to:

Tweeter Newco, LLC
c/o Schultze Asset Management, LLC
3000 Westchester Avenue
Purchase, New York 10577
Attn: George J. Schultze
Tel: (914) 701-5260
Fax: (914) 701-5269

With copies to:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Attn: Robert J. Moore, Esq.
Tel: (213) 892-4501
Fax: (213) 629-5063

and

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Attn: Neil J Wertlieb, Esq.
Tel: (213) 892-4410
Fax: (213) 892-4710

or to such other address as any party may have furnished to the others in writing in accordance
herewith, except that notices of change of address shall only be effective upon receipt.

   5.9 Governing Law. This Agreement shall be construed in accordance with
and governed by the laws of the State of Delaware applicable to agreements made and to be
performed wholly within that jurisdiction. Each of the parties hereto hereby irrevocably and
unconditionally consents to submit to the exclusive jurisdiction of the United States Bankruptcy
Court in Wilmington, Delaware, for any litigation between Tweeter and Tweeter Opco arising
out of or relating to this Agreement and the transactions contemplated hereby (and agree not to
commence any litigation relating thereto except in such court unless such court declines to accept
jurisdiction, in which case a party may bring suit in any court having jurisdiction), and further

9

agreed that service of any process, summons, notice or document by U S. registered mail to its respective address set forth in Section 5.8 shall be effective service of process for any litigation brought against it in such court. Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in such court, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

5.10    Survival of Certain Obligations. Notwithstanding the termination of this Agreement and the provisions of Article 4, Tweeter Opco's obligations to the Chief Liquidation Officer under Article 3 shall survive through the Term.

5.11    No Third Party Beneficiaries. This Agreement is intended and agreed to be solely for the benefit of the parties hereto and no other party shall accrue any benefit, claim or right of any kind whatsoever pursuant to, under, by or through this Agreement.

5.12    Counterparts. This Agreement may be executed simultaneously in one or more counterparts, with the same effect as if the signatories executing the several counterparts had executed one counterpart. All such executed counterparts shall together constitute one and the same instrument. Facsimile or other electronic signatures shall have the same legal effect as original signatures.

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of Tweeter Opco and Sellers on the date first above written.

**"TWEETER OPCO"**
**TWEETER NEWCO, LLC:**

By: _____
Name:_____
Title:_____


**"SELLERS"**

**TWEETER HOME ENTERTAINMENT GROUP, INC.:**
Chapter 11 Debtor and Debtor In Possession

By: _____
Name:_____
Title:_____

**SOUND ADVICE OF ARIZONA, INC.**

By: _____
Name:_____
Title:_____

**NEW ENGLAND AUDIO CO., INC.**

By: _____
Name:_____
Title:_____

**NEA DELAWARE, INC.**

By: _____
Name:_____
Title:_____


**HILLCREST HIGH FIDELITY, INC.**

By: _____
Name:_____
Title:_____

**SOUND ADVICE, INC.**

By: _____

Name: _____

Title: _____


**SUMARC ELECTRONICS, INC.**

By: _____

Name: _____

Title: _____


**THEG USA, L.P.**
By:  **NEW ENGLAND AUDIO CO., INC.**
Its:  General Partner

By: _____

Name: _____

Title: _____


By:  **NEA DELAWARE, INC.**
Its:  Limited Partner

By: _____

Name: _____

Title: _____

## SCHEDULES

The attached schedules (each a "Schedule", and together, the "Schedules") are furnished to Tweeter Newco, LLC, pursuant to the Asset Purchase Agreement, dated as of June 26, 2007, as may be amended and/or restated from time to time, by and among Tweeter Newco, LLC, Tweeter Home Entertainment Group, Inc. and each of the Company's direct and indirect subsidiaries listed that is a party thereto (the "Agreement"). The Schedules contain proprietary and confidential information of the Sellers. The headings contained in the Schedules are for reference purposes only and shall not affect in any way the meaning or interpretation of the Schedules. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Agreement.

The Sellers have made the representations, warrants and covenants set forth in the Agreement subject to the matters disclosed in the Schedules. Except to the extent set forth in the Agreement, the inclusion of a matter in any Schedule (i) shall not constitute, or be deemed to constitute, an admission of liability or obligation to third parties concerning such matter, and (ii) does not represent a determination by the Sellers that such item did not arise in the ordinary course of business.

Except to the extent set forth in the Agreement, inclusion of an item in the Schedules, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such item is material, or to establish any standard of materiality or to define further the meaning of such terms for purposes of the Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent on its face.

## SCHEDULE 1.1(a)

### Distribution Centers

**Distribution Centers**

170 Canton, MA
270 King of Prussia, PA
570 Houston, TX
870 Des Plaines, IL
970 Pembroke Park, FL
1070 Phoenix, AZ

**Distribution Centers – Closed**

370 Office/Distrib/Service – Atlanta, GA
670 Vista, CA

**Third Party Logistic Locations – Month to Month with 30 day out notification**

**Vendor Name and Address**

C& M Warehouse, 95 Leggett St, East Hartford CT 06108
The Belts Corporation, 6925 San Tomas Road, Elkridge, MD 21075
Charlotte Van & Storage, 2320 Presidential Dr., Suite 109, Durham, SC 27703
Scherer Construction & Engineering, 2155A 14th Circle North, St. Petersburg, FL 33713
Precise Transportation Services, 1900 W. New Hampshire St., Orlando, FL 32804

## SCHEDULE 1.1(k)

### Knowledge of Sellers

Joseph McGuire
Gregory W. Hunt
Robert Staples
Philo Pappas
Patrick Reynolds
William Morrison
Bob Tassone
Duane Oser

## SCHEDULE 1.1(b)

Stores

Attached

| # | Name | Address | City | ST | Zip |
|---|------|---------|------|----|----|
| **Closed in GOB Sale** | | | | | |
| 102 | Boston University | 880 Commonwealth Avenue | Boston | MA | 02215 |
| 110 | North Haven | 70 Universal Drive | North Haven | CT | 06473 |
| 112 | Crystal Mall | | | CT | |
| 115 | Albany | 161 Washington Avenue | Albany | NY | 12205 |
| 117 | Saratoga | 3072 Route 50 | Saratoga Springs | NY | 12866 |
| 119 | Saugus | 444 Broadway, Rte. 1 | Saugus | MA | 01906 |
| 124 | Milford | 1712 Boston Post Road | Milford | CT | 06460 |
| 125 | Holyoke | 27 Holyoke Street | Holyoke | MA | 01040 |
| 130 | Auburn | 441 Southbridge Street | Auburn | MA | 01501 |
| 214 | Walnut Street | 1429 Walnut Street | Philadelphia | PA | 19102 |
| 224 | Mays Landing | 4215 Black Horse Pike | Mays Landing | NJ | 08330 |
| 302 | Athens(LB) | 3970 Atlanta Hwy. | Bogart | GA | 30622 |
| 305 | Gwinnett | 2021 West Lidell Road | Duluth | GA | 30096 |
| 307 | Johnson Ferry | 1062-A Johnson Ferry Road | Marietta | GA | 30068 |
| 310 | Town Center | 1155 Ernest Barrett Pkwy. | Kennesaw | GA | 30144 |
| 312 | Hoover | 1642 Montgomery Hwy. | Hoover | AL | 35216 |
| 313 | Snellville | 2059 Scenic Hwy. | Snellville | GA | 30078 |
| 320 | Coolsprings/Franklin | 1728 Galleria Boulevard | Franklin | TN | 37067 |
| 322 | Fayetteville | 105B Promenade Pkwy. | Fayetteville | GA | 30214 |
| 323 | Huntsville | 6275 University Drive | Huntsville | AL | 35806 |
| 325 | Chattanooga | 2114 Gunbarrel Road | Chattanooga | TN | 37412 |
| 329 | University Place | 9605 North Tryon Street | Charlotte | NC | 28262 |
| 330 | Nashville West-End | 2404 West End Avenue | Nashville | TN | 37203 |
| 342 | NOW/Knoxville | 8416 Kingston Pike | Knoxville | TN | 37919-5374 |
| 505 | Dallas Parkway (D) | 13900 Dallas Pkwy. | Dallas | TX | 75240 |
| 506 | Caruth Plaza (D) | 9100 N. Central Expwy. | Dallas | TX | 75231 |
| 507 | Frisco(LB) (D) | 2595 Preston Road | Frisco | TX | 75034 |
| 509 | Humble(LB) (H) | 20210 Eastex Freeway | Humble | TX | 77338 |
| 511 | Lewisville(LB) (D) | 2260 South Interstate Hwy 35 | Lewisville | TX | 75067 |
| 514 | Baybrook (H) | 18980 Gulf Freeway | Friendswood | TX | 77546 |
| 515 | Southlake (D) | 2801 E. Southlake Blvd., Ste. 180 | Southlake | TX | 76092 |
| 518 | Katy (H) | 1150-B Fry Road | Houston | TX | 77084 |
| 550 | HCPlano (D) | 3309 Dallas Parkway | Dallas | TX | 75093 |
| 601 | Mission Valley | 1144 Camino Del Rio N | San Diego | CA | 92108 |
| 602 | Sports Arena | 3445 Sports Arena Blvd | San Diego | CA | 92110 |
| 605 | Escondido | 1346 W. Valley Pkwy. | Escondido | CA | 92029 |
| 606 | Vista | 1950 Hacienda Drive | Vista | CA | 92083 |
| 608 | Encinitas | 172 N. El Camino Real | Encinitas | CA | 92024 |
| 610 | Clairemont | 5504 Balboa Avenue | San Diego | CA | 92111 |
| 611 | Palm Desert | 72-885 Highway 111 | Palm Desert | CA | 92260 |
| 615 | La Jolla | 8610 Genessee Avenue | San Diego | CA | 92122 |
| 616 | La Mesa | 8827 Murray Drive | La Mesa | CA | 91942 |
| 617 | Temecula | 41669 Winchester Rd. - 101 | Temecula | CA | 92590 |
| 618 | Costa Mesa | 1835 Newport Boulevard | Costa Mesa | CA | 92627 |
| 624 | Mission Viejo | 25552 El Paseo | Mission Viejo | CA | 92692 |
| 803 | Century | 2828 N. Clark Street | Chicago | IL | 60657 |
| 812 | Crystal Lake | 6119 NW Hwy. | Crystal Lake | IL | 60014 |
| 813 | Gurnee | 6557 Grand Avenue | Gurnee | IL | 60031 |
| 916 | West Kendall | 1220 SW. 88th Street | Miami | FL | 33186 |
| **Previously Closed/Subleased Stores** | | | | | |
| 336 | Rivergate | | Madison | TN | |
| 921 | Tallahassee Mall | | Tallahassee | FL | |
| 309 | Southlake | | Morrow | GA | |
| 314 | Douglasville | | Douglasville | GA | |
| 317 | Macon | | Macon | GA | |
| 818 | West Dundee | | West Dundee | IL | |
| 225 | Springfield | | Springfield | PA | |
| 619 | Chino | | Chino | CA | |
| 613 | Riverside | | Riverside | CA | |
| 804 | Mount Prospect | | Mt. Prospect | IL | |

| # | Name | Address | City | ST | Zip |
|---|------|---------|------|----|----|
| 910 | Hialeah | | Hialeah | FL | |
| 201 | Maple Shade | | | NJ | |
| 602-I | Install | | San Diego | CA | |

**Closed Not part of original GBO**

| | | | | | |
|---|------|---------|------|----|----|
| 623 | Henderson | 1205 West Sunset Road | Henderson | NV | 89014 |

**Stores**

| # | Name | Address | City | ST | Zip | |
|---|------|---------|------|----|----|---|
| 103 | Newton | 14 Needham Street | Newton | MA | 02459 | |
| 104 | Burlington | One Wheeler Road | Burlington | MA | 01803 | |
| 105 | Dedham | 805 Providence Highway - Route 1 | Dedham | MA | 02026 | |
| 106 | Buckland Hills | 110 Slater Street | Manchester | CT | 06040 | |
| 107 | Framingham | 86 Worcester Road | Framingham | MA | 01701 | |
| 108 | Hyannis | | Hyannis | MA | 02601 | |
| 109 | Avon | 195 West Main Street | Avon | CT | 06001 | |
| 111 | Newington | 2661 Berlin Turnpike | Newington | CT | 06111 | |
| 113 | Hanover | 1810 Washington Street | Hanover | MA | 02339 | |
| 114 | Seekonk | 30 Commerce Way-Rte. 6 | Seekonk | MA | 02771 | |
| 116 | Warwick | 1301 Bald Hill Road | Warwick | RI | 02886 | |
| 118 | Peabody | 242 Andover St. - Rte. 114 | Peabody | MA | 01960 | |
| 120 | Braintree | 180 Pearl Street | Braintree | MA | 02184 | |
| 121 | Danbury | 109 Federal Road | Danbury | CT | 06810 | |
| 122 | Salem | 301 South Broadway | Salem | NH | 03079 | |
| 123 | Boylston | 350 Boylston Street | Boston | MA | 02116 | |
| 126 | Portsmouth | 2001 Woodbury Avenue | Portsmouth | NH | 03801 | |
| 127 | Nashua | 293 Daniel Webster Hwy. | Nashua | NH | 03060 | |
| 128 | Attleboro | ### Washington Street | N. Attleboro | MA | 02760 | |
| 129 | Portland | 335 Maine Mall Road | South Portland | ME | 04106 | |
| 131 | S Willow | 1111 South Willow | Manchester | NH | 03103 | |
| 202 | Reading | 1665 State Hill Road | Wyomissing | PA | 19610 | |
| 203 | King of Prussia | 268 Dekalb Pike | King of Prussia | PA | 19406 | |
| 204 | Marlton | Rte 38 & Alexander Ave. | Maple Shade | NJ | | 8052 |
| 205 | Lancaster | 898D-1 Plaza Blvd. | Lancaster | PA | 17601 | |
| 207 | Allentown | 1941 Whitehall Mall | Whitehall | PA | 18052 | |
| 210 | Montgomeryville | 166 Montgomery Mall | North Wales | PA | 19454 | |
| 211 | York | 2920 Whiteford Road | York | PA | 17402 | |
| 212 | Concord Pike | 5333 Concord Pike | Wilmington | DE | 19803 | |
| 213 | Oxford Valley | 502 N. Oxford Valley Road | Langhorne | PA | 19047 | |
| 215 | Princeton | 3311 Brunswick Pike | Lawrenceville | NJ | 08648 | |
| 216 | Deptford | 1563 Almonesson Road | Deptford | NJ | 08096 | |
| 217 | Kirkwood | 3926 Kirkwood Hwy. | Wilmington | DE | 19808 | |
| 218 | Columbia | 6455 Dobbin Road | Columbia | MD | 21045 | |
| 219 | Owings Mills | 10391 Reisterstown Road | Owing Mills | MD | 21117 | |
| 220 | Bel Air | 570 Baltimore Pike | Bel Air | MD | 21014 | |
| 221 | Glen Burnie | 585 East Ordinance Road | Glen Burnie | MD | 21060 | |
| 222 | Towson | 1017 York Road | Towson | MD | 21204 | |
| 226 | Paxton Ctr | 5125 Jonestown Road | Harrisburg | PA | 17112 | |
| 228 | Rockville | 11611 Old Georgetown Road | Rockville | MD | 20852 | |
| 229 | Fairfax | 10890 Lee Hwy. | Fairfax | VA | 22031 | |
| 230 | Balleys Crossroads | 5857 Leesburg Pike | Bailey's Crossroads | VA | 22041 | |
| 231 | Fredericksburg | 1580 Central Park Boulevard | Fredericksburg | VA | 22401 | |
| 232 | Manassas | 7317 Sudley Road (Parcel address | Manassas | VA | 20109 | |
| 233 | Plymouth Meeting | 1001 Ridge Pike | Conshohocken | PA | 19428 | |
| 241 | Tysons Corner | 8365A Leesburg Pike (Route 7) | Vienna | VA | 22182-2410 | |

# SCHEDULE 1.1(b)
## STORES

| # | Name | Address | City | ST | Zip |
|---|------|---------|------|-----|-----|
| 243 | Bowie | 4501 Mitchelville Road | Bowie | MD | 20716 |
| 301 | Alpharetta | 10889 Alpharetta Hwy. | Roswell | GA | 30076 |
| 303 | Buckhead | 3135 Peachtree Road | Atlanta | GA | 30305 |
| 316 | Mill Creek | 3310 Buford Drive | Buford | GA | 30519 |
| 318 | Greenville | 525 Haywood Road | Greenville | SC | 29607 |
| 319 | Mt Pleasant | 1748 Towne Centre Way | Mt Pleasant | SC | 29464 |
| 327 | South Blvd | 5415 South Blvd. | Charlotte | NC | 28210 |
| 328 | Pineville | 11409 Carolina Place Pkwy. | Pineville | NC | 28134 |
| 333 | Columbia | 343 Harbison Boulevard | Columbia | SC | 29212 |
| 337 | NOW/Cary | 337 Crossroads Blvd | Cary | NC | 27511-6895 |
| 338 | NOW/Durham | 1810 Martin Luther King Jr Pkwy | Durham | NC | 27707-3584 |
| 339 | NOW/Greensboro | 5417 Sapp Rd | Greensboro | NC | 27409-8926 |
| 340 | NOW/Raleigh | 7105 Glenwood Ave | Raleigh | NC | 27612-7146 |
| 341 | NOW/Winston-Salem | 1606A South Stratford Rd | Winston-Salem | NC | 27103-2924 |
| 501 | Kirby (H) | 5310 Kirby Drive | Houston | TX | 77005 |
| 502 | Westheimer (H) | 6522B Westheimer Road | Houston | TX | 77057 |
| 504 | Sugarland(LB) (H) | 16820 South West Fwy. | Sugarland | TX | 77478 |
| 508 | Memorial City (H) | 10201 Katy Fwy. | Houston | TX | 77024 |
| 512 | Woodlands (H) | 27702 I-45 N. Woodridge Plaza | The Woodlands | TX | 77385 |
| 622 | Summerlin | 8950 W. Charleston Blvd., Suite A | Las Vegas | NV | 89117 |
| 801 | Deerfield | 350 Lake Cook Road | Deerfield | IL | 60015 |
| 802 | Downers Grove | 1202-1A 75th Street | Downers Grove | IL | 60516 |
| 805 | Vernon Hills | 700 W. Town Line Road | Vernon Hills | IL | 60061 |
| 806 | Schaumburg | 935 East Golf Road | Schaumburg | IL | 60173 |
| 807 | Fox Valley | 4411 Fox Valley Center Drive | Aurora | IL | 60505 |
| 808 | Michigan Ave | 900 N. Michigan Avenue | Chicago | IL | 60611 |
| 809 | Oak Brook | 1600 W. 16th Street | Oak Brook | IL | 60523 |
| 810 | Edens Plaza | 3232 Lake Avenue | Wilmette | IL | 60091 |
| 811 | Orland Park | 9520 West 159th Street | Orland Park | IL | 60462 |
| 814 | Geneva | 1575A South Randall Road | Geneva | IL | 60134 |
| 901 | Coral Gables | 1222 South Dixie Hwy. | Coral Gables | FL | 33146 |
| 902 | Sarasota | 6307 South Tamiami Trail | Sarasota | FL | 34231 |
| 903 | Orlando 1(Colonial) | 4835 East Colonial Drive | Orlando | FL | 32803 |
| 904 | Orlando 2(Altamonte) | 614 East Altamonte Drive | Altamonte Springs | FL | 32701 |
| 905 | Ft Lauderdale | 4008 North Federal Hwy. | Ft. Lauderdale | FL | 33308 |
| 906 | W Palm Beach | 2275 Palm Beach Lakes Blvd. | West Palm Beach | FL | 33409 |
| 907 | St Petersburg | 2925 Tyrone Blvd. | St. Petersburg | FL | 33710 |
| 908 | Tampa 2(Fowler) | 1102 East Fowler Avenue | Tampa | FL | 33612 |
| 909 | Boca Raton | 351 NE 51st Street | Boca Raton | FL | 33431 |
| 911 | Plantation | 7676 Peters Road | Plantation | FL | 33324 |
| 912 | Orlando 4(Sandlake) | 1431 Sandlake Road | Orlando | FL | 32809 |
| 913 | Clearwater | 27205 US Hwy. 19 North | Clearwater | FL | 33761-2991 |
| 914 | Jacksonville 1 | 9590 East Atlantic Blvd. | Jacksonville | FL | 32225 |
| 915 | Jacksonville 2 | 6000 Lake Gray Blvd. | Jacksonville | FL | 32224 |
| 917 | Fort Myers | 12519 Cleveland Avenue | Fort Myers | FL | 33907 |
| 919 | Aventura | 17641 Biscayne Blvd. | Aventura | FL | 33160 |
| 920 | Naples | 4133 Tamiami Trail | Naples | FL | 34103 |
| 922 | N Palm Beach | 12089 U.S. Hwy. One | N. Palm Beach | FL | 33408 |
| 923 | Tampa 1(Dale Mabry) | 2905 N. Dale Mabry | Tampa | FL | 33607 |
| 924 | Kendall | 11805 South Dixie Hwy. | Miami | FL | 33156 |
| 925 | Jacksonville 3 | 8805 Southside Blvd. | Jacksonville | FL | 32256 |
| 926 | Pembroke Pines | 11330 Pines Blvd | Pembroke Pines | FL | 33026 |
| 929 | Jensen Beach | 3554 N.W. Federal Hwy | Jensen Beach | FL | 34957 |

| # | Name | Address | City | ST | Zip |
|---|------|---------|------|----|----|
| 1001 | SC Pima Road | 15672 North Pima Road | Scottsdale | AZ | 85260 |
| 1002 | SC Chandler | Casa Paloma Shopping Center | Chandler | AZ | 85226 |
| 1004 | SC Arrowhead | 6950 West Bell Road | Glendale | AZ | 85308 |
| 1006 | SC Camelback | 1701 E Camelback Road | Phoenix | AZ | 85016 |

**Office Space**

| | | | | |
|---|---|---|---|---|
| 185 | Headquarters | Canton | MA | |
| 985 | 301 E. Las Olas Blvd. | Ft. Lauderdale | FL | |
| 3CC | Roswell | Roswell | GA | |
| 585D | Hillcrest Office | Dallas | TX | |

## SCHEDULE 4.7

Inventory Taking

# SCHEDULE 4.7

# INVENTORY TAKING INSTRUCTIONS
# TWEETER HOME ELECTRONICS GROUP

## Overview

It is the policy of the Tweeter Home Entertainment Group ("Tweeter") to conduct regular physical inventories of all facilities in order to determine aggregate inventory valuations and to identify shrinkage at each facility.

Tweeter normally uses its own scanners to conduct its own inventories. For purposes of the inventory taking in connection with the Tweeter's sale of substantially all of its assets to Purchaser, however, Tweeter and the Purchaser have agreed that Purchaser and/or its subsidiaries (in such capacity, the "ISC"), with the assistance of the Leased Employees (as defined in, and provided pursuant to, the Transition Services Agreement), shall conduct the inventory taking pursuant to the definitions and provisions of Agreement, these inventory taking instructions and such other procedures and policies as Tweeter and the Purchaser may mutually agree during such inventory taking. The procedures set forth herein are the inventory procedures to be followed by the ISC. Please keep in mind that these are short notice inventories and the stores have just received notification that the inventories are to be conducted. The store management will have very little time to prepare. You will need to be helpful and understanding and offer assistance when needed. During the inventory counting process, representative(s) of Tweeter, the Official Committee of Unsecured Creditors (the "Committee") and the Purchaser shall be permitted to accompany the personnel of the ISC.

When the inventory is completed, the custom final report will be released directly to the internet. Once the final report is released, Tweeter will process the file and produce a variance report that will be electronically sent back to the store. The crew manager and one other person will stay to wait for the variance report. Tweeter and the Purchaser will jointly research the variance report.

If errors are found, corrections will be made to the ISC inventory. Only adjustments agreed to by BOTH Tweeter and the Purchaser will be made to the original inventory counts. Once the variance report is researched and all corrections are made, the final section report will be printed and the inventory transmitted to processing.

## Special Instructions

Tweeter's store managers and [title for head distribution centers] will act as the crew managers for the inventories for each of their respective stores and distribution centers. During the pre-inventory visit and during the inventory, the ISC must review with the store or the distribution center, how the ISC will count the inventory. A review of the ISC's standard procedures should be done with Tweeter, the Purchaser and any store or distribution center personnel involved in the inventory taking.

Specific items to be reviewed include:

       a.    The definition of "Inventory".
       b.    Location of bar-coded ticket on merchandise.
       c.    What to do if there is no UPC or Vendor number available.
       d.    What to do if invalid UPC/Vendor item numbers.

For purposes of this inventory taking, "Inventory" means (i) all finished goods inventory that is owned by Sellers for resale at retail and located at any Location as of the Closing Date, including, On Order Inventory and Inventory subject to Gross Rings.

"On Order Inventory" means first-quality goods for resale at retail (A) to be received at the Locations in the ordinary course from Sellers' vendors on or before the Location Receipt Date, (B) which are consistent as to type, quality and mix as presently located at the Stores, and (C) which are ticketed at Sellers' expense and in accordance with Sellers' historic ticketing practices upon delivery to the Stores.

Notwithstanding the foregoing, "Inventory" shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Sellers; (2) goods held by Sellers on memo, on consignment, or as bailee; (3) furnishings, trade fixtures, equipment and improvements to real property which are located in any Location; (4) any goods, inventory or products generally given away free with purchase; (5) installation parts/supplies and kits; (6) cell phones and cell phone accessories; (7) build to order merchandise; (8) RTV/to be repaired merchandise; (9) merchandise subject to Manufacturer's recall; and (10) Defective Inventory.

"Defective Inventory" means any item of merchandise not salable in the ordinary course because it is dented, worn, scratched, broken, faded, torn, mismatched, or merchandise affected by other similar defects rendering it not first quality, that is sold to the Purchaser on the Closing Date.

Any merchandise that is not included in the definition of Inventory shall be tracked separately and listed on custom final report and reconciled as set forth in these inventory taking procedures.

# The Distribution Centers

## THE DC PREPARATION

In advance of the physical count, the ISC will have devised or obtained from Tweeter a Physical Inventory Control Map, used to administer the:

- ❑ Organization of the facility into manageable counting sections
- ❑ Assignment of personnel to count each of these sections
- ❑ Efficiency of all participants throughout the process

While the details of locators and counters may vary by facility, each map should conform to the general, graph design as follows: (See map example.)

- ❑ The vertical axis is a sequential list of counting divisions each consisting of a specific group of locators. Altogether, they represent every locator in the building.
- ❑ The horizontal axis provides entry space for the names of the two counters assigned to each section, along with their inventory gun team designations. Next follows room provided to log the job numbers of any reports used to settle comparison discrepancies due to differing counts within each section, along with the names of the correctors rechecking. Once those counts are reconciled as identical, the section is marked as complete, continuing until the entire map has been entirely filled out.

Prior to the inventory, the ISC shall examine and ensure the operation of the inventory capture guns and remedy any failures.

The ISC shall meet with the inventory participants to give participants their assignments for the upcoming inventory. These assignments fall into three groups:

- Preparation Team, which gets the building ready
- Counting Team, which conducts the actual counts
- Corrections Team, which reconciles any discrepancies between the compared counts of each counting section, and which subsequently also reconciles any deviation discrepancies between those completed counts and the existing record of quantity on hand.

Before the inventory is conducted, the ISC shall prepare two reports for use by the prep team to assist in the proper identification of products and their locators:

- Items Listed by Locator (3-38-31)
- Items Listed by Item number (3-38-30)

Using these two reports, the prep team conducts a general building clean up and organization, which should include for example:

- Labeling products with their item numbers and locator positions, to avoid unnecessary locator discrepancies
- Separating different products occupying the same bin
- Identifying and labeling any product without an apparent item number
- Putting up cautionary " count as" signs for multi packs and speakers
- Moving any open boxes or master pack anomalies to the front of their groupings
- Filling in empty lower bins with product from higher positions
- Auditing and correcting any locators known to be frequently inaccurate
- Finally, each inventory gun is labeled to show an operator name and team assignment
- All guns and extra batteries are put on charge

The ISC shall then confirm that all receiving has been completed prior to the inventory, and that all orders to be delivered on inventory day have been received. In order to avoid any last minute irregularities when counting starts, the ISC shall run and clear the following reports:

- Pending transfers, both inbound and outbound (3-11-20),
- Unconfirmed inbound transfers (2-95, 8,5),
- Items Not Located (3-38-24),
- Negative Product on Hand (3-67),
- Discrepancies between locator and quantities on hand (3-38-34).

Product that is on order, in transit or not received, but paid cash in advance shall be counted pursuant to the procedures set forth below for such inventory.

## THE DAY OF THE COUNT

The Physical Inventory consists of three stages, which can overlap during their execution:

- Count Collection: by two gun operators per counting section,
- Comparison Reconciliation: of discrepancies between those counts,
- Deviation Reconciliation: of completed counts and existing on hand quantities, which differ.

Completed counting sections are marked off on the inventory map informing the ISC as to where everyone is at all times, how efficiently the count is progressing, and where it may be necessary to redirect efforts.

Before the count can begin, the ISC shall again run all of the reports in order to make sure that they contain no surprising changes, such as new transfers, not located items, etc. The ISC shall also run the Item-by-Item listing, Item by Locator, and a Valuation report (3-63) as up to the minute resources to help identify products and their most recent locator positions.

The ISC shall use inventory guns to be supplied by Tweeter. The ISC, with the assistance of Tweeter personnel, shall set such collector guns up for use. In order to be so set up, the ISC shall direct each operator to turn on her or his gun and from the menu options choose as follows:

- ❑ Inventory (4),
- ❑ Physical Inventory (4),
- ❑ Team 1 or Team 2, choice must match the gun as labeled,
- ❑ Boxed.

**If a gun failure occurs during the counting process, the counter is instructed to bring the gun immediately to the ISC for correction.**

## Physical Counts

- ❑ Following gun set up; the ISC should send counters to their first assignments. The count is conducted as a double blind, independent inventory gun capture or key entry of data in the following order:
    1. Locator identity
    2. Item identity,
    3. Item quantity.

Per section, this data is entered into two inventory guns, one each designated as belonging to Team 1 or Team 2. Each of the two operators begins by counting at an opposite end of the count section; they will pass each other and again finish at opposite ends. Each counter also places an inventory count sticker on a representative piece of each product. The stickers differ in color for each team and are the indicators of an item having been counted by both. Use stickers liberally. For each display item place a sticker directly on the SKU label to show that it has been counted. For electronics with multiple components, place a sticker on each piece. Stickers will be used as a visual to ensure that everything was inventoried. If an item or shelf is not sickered, a question will be asked. Whenever a counter finishes a section, she or he must report to the ISC before moving to the next assignment.

## Counting Instructions:

1. The counting system will capture the following information:

| SECTION: | Enter the section number. |
|---|---|
| **AREA:** | **Area breaks for individual shelf totals** |
| | **BREAKDOWN: Used to identify discounts – although breakdowns are available no discounting should be done.** |
| **ITEM #** | **Scan or key enter the UPC number or alphanumeric vendor item number. If this is invalid, call for an SKU check. If no valid number can be found, call for a SKU check. If no valid number can be found, override and accept the invalid number. Any invalid number** |

|  | will prompt for a SKU and COST (which will need to be provided by Tweeter personnel). |
|---|---|
| **PRICE:** | Key entry of the lowest marked price. If the data terminal alarms when the price is entered, please verify that it is the correct price. If correct, accept price entry. Terminal will require override of prices under $___ and over $____. |
| **QUANTITY:** | Allows for a toggle between AR-1 and multiple quantity entry. |

2. Upon completion of each section, the counter should double-check their pieces. Counters should place their name and number of pieces and total dollars on the section tag along with a sticker.

3. The Purchaser and Tweeter will review each section detail and sign the ISC section tag to acknowledge that such section has been reviewed. The ISC is responsible for ensuring that the Purchaser and Tweeter representatives are actively reviewing each section.

4. Each ISC counter should transmit after 45 minutes of counting. This will allow the ISC crew manager to print 100% requested details for audit purposes. Details will be checked by Purchaser and tweeter representatives.

5. **Counters will have to key price when prompted by terminals. All merchandise with a retail value of $100 or greater will require that the lowest ticket price on the item be entered.**

## Comparison Reconciliation

Once both counters of any particular section have reported completion, the ISC shall run a Team 1/Team 2 Comparison Audit (3-30-31), continuing as follows:

- ❑ Branch: your branch
- ❑ Book: 1
- ❑ Section: A
- ❑ By Locator: L
- ❑ Range of Locations: the beginning and ending locators for the section to be compared
- ❑ Printer: your spool

The ISC MUST then exit from this Comparison Audit screen. Remaining here will block other users. Following exit from the Comparison Audit screen, the ISC shall print a copy of the Comparison Audit for immediate review:

- ❑ To print the report from spool: 34-1
- ❑ Identify your report's job number.
- ❑ To print job: 2
- ❑ Enter the job number, followed by the usual choices for any print from spool.
- ❑ Keep the comparison audits on spool to make them available to LP.

If the Comparison Audit lists any discrepancies between the counts, the ISC shall assign it to a comparison corrector, who determines the true quantities by recounting the items in dispute for that section, and then entering the relative quantity differences into both teams' guns to achieve a data match. This cycle of recount, data reentry, and comparison report review is repeated as many times as necessary to produce the final, empty comparison report that allows that count section to be mapped as finished.

**The last locator to be counted is HDIN, which has been designated to hold any previously DZ'd product returning from HD during the day. This is to ensure that all products have arrived to be counted as expected.**

After all of the individual sections have been counted, the ISC shall run the comparison discrepancy report for the entire building, and if necessary, repeat the correction cycle until the report is empty.

## Deviation Reconciliation

The ISC shall then run an Instant Deviation Report (found in the Physical Inventory Menu) to produce a list of discrepancies between the finalized compared count and existing quantities on hand. Each item listed on the deviation report shall be color coded and classified into one of these four statuses:

- ❑ Known shortages, pre inventory (derived from your IC Lost report),
- ❑ Known overages, pre inventory ( IC should have been keeping these pieces together),
- ❑ New shortages,
- ❑ New overages.

The ISC shall begin reconciliation by concentrating on the new deviations, shortages first.

The ISC shall progress by giving first priority to the highest dollar value items working on through to the lowest value items.

For each item listed in deviation, the ISC shall print an Item Inquiry by Locator sheet (3-38-1), which lists every pre inventory locator for that item number. The ISC shall then assign a corrector to go and recount the item number in all of those places. The ISC shall also direct other people to canvas the building looking for any of these items that could be elsewhere.
If a count is confirmed, the deviation stands. If a count is revised, then matching adjustments to both teams' count data are entered either by using both teams' guns or through the Warehouse Comparison Input screen (found in the Physical Inventory Menu). The ISC will then also rerun the Teams 1/2 comparison report for all locators to be sure that team count corrections continue to match. The deviation report shall be repeatedly run at the ISC's discretion after any significant, number of corrections have been made in order to produce progressively shorter lists of remaining deviations. Corrections must continue to match for both teams.

As final deviation remedies, the ISC can investigate unresolved deviations by looking at history of item movement through transfers or sales to reveal the source of the deviation and determine the appropriate correction to resolve it. Tweeter and the Purchaser shall then be given the remaining, unresolved deviation report as the Physical Inventory result. Tweeter and the Purchaser must then mutually agree to accept such report as final or to require further resolution efforts. The ISC shall retain a copy of the accepted deviation report results along with supporting documents including the prep reports, the comparison reports, the deviation reports and the pre existing lost item report, all to be available for examination upon request by the Purchaser or Tweeter.

# THE LP REVIEW

After the finalized counts become established as official on hand numbers, the ISC shall select a sample of products and conduct test counts to confirm accuracy. For any count the ISC finds to differ from the reported inventory physical count, the ISC may choose to count an additional specified amount of products per discovered miscount.

Additionally, because information regarding the counted locations of some overage deviations is typically not available until this time, the ISC shall conduct recounts on those items and submit any needed adjustments to the Purchaser and Tweeter.

# All Other Locations

## Organize the Display Floor

Prior to the inventory count, the ISC shall locate, identify and tag with barcodes, all products to be counted. Among other things, the ISC shall:

- ❑ Locate and tag merchandise in sales associates' drawers, under the counter storage and file cabinets.
- ❑ Make sure all bulk wire displays have bar code tags and that the remaining lengths of wire are easily identifiable.
- ❑ Measure and tag any loose wire before the actual inventory count.
- ❑ Make sure in-wall displays are tagged and that the gun can read them if they are up high.
- ❑ Check the pedestal displays for hidden inventoried SKU's including cables, Monster Power and accessories.
- ❑ Check the mobile rooms and counter areas carefully (some displays have inventoried product on what appears to be a factory display).
- ❑ Make sure any and all loose product has a barcode.

## Organize the Stockroom

Prior to the inventory count, the ISC shall also:

- ❑ Make sure there are no store stock pieces mixed in with customer units in the service area.
- ❑ Tag with price tag (for the barcode), all merchandise not in a box or in bubble wrap.
- ❑ Organize product by brand, categories and model number, or category, brand and model number (making sure all barcodes are facing outward).
- ❑ Look behind and under shelves to locate misplaced merchandise.
- ❑ Verify that open boxes contain the item indicated by the code on the carton.
- ❑ Determine the item number of any unlabeled item and apply a bar code label, again using a price tag for the barcode.

## Review Reports Prior To Inventory

Prior to the inventory count, the ISC shall further:

- ❑ Check all inventory transfers on the unconfirmed transfer report. Follow up with the branches involved and confirm all transfers that have been received. If no proof of an inbound transfer exists, contact sending branch to advise of return transfer document.
- ❑ Research the unconfirmed out bound and in bound reports, 25-07 and 25-06 from the start menu. Cycle count any items on that report to see if your shortages may be due to a transfer that was not completed. If it appears this is a possibility, contact the receiving branch to verify their count and resolve by completing the transfer if appropriate.
- ❑ Research items on the negative quantity on hand report. Resolve and clear all items on report.
- ❑ Review all lines on the paid in full report. Process all confirmed transactions including negative line items. Confirm with sales associates and or delivery personnel prior to processing paperwork.

- Review open purchase orders, 28-03, for possible receipt without confirmation. Verify counts and receive where appropriate.
- Review loaner report. Verify that all loaners are still valid. Return any that are not and process through inventory adjustment form report if applicable.
- Review Balance Due report, go over thoroughly and research every line.
- Review all previously submitted adjustment forms to make sure adjustments have been made and that they were accurate.

# Physical Inventory Data Collector Procedures

If the ISC uses the data collectors regularly used by Tweeter, the following procedures shall be employed by the ISC –

## Downloading items into the data collector

- FROM ENTER PASSWORD – Type the password "02MGR" or "SALES", then # 27
- Choose selection #1 - DATA COLLECTOR DOWNLOAD
- The screen will say - download to data collector will not support and it lists 5 lines of information with the last one saying continue (Yes/N) just hit TAB key.
- Now it will ask for the data collector branch, enter branch location – (0101, 0810, 0920, etc.) and then TAB.
- The computer will now ask for the Data Collector ID #, enter the last three digits of the serial number from the collector and then TAB.
- Next you will be prompted to enter Book Code (the system will automatically prompt the data collector ID # in the book code field, CLEAR this out by hitting your Esc key, and enter a **1** in for the Book Code. It is very important that you put in a **1**, not a 01, or a 001 but just a **1** and then **TAB** through Section # and Team #. No matter how many data collectors you have the book code should always be a **1,** this will help you in the deviation process. Remember to hit the ESC key and not the space bar when trying to clear out the book code.
- Now the screen will show Perform the following steps before continuing. Stop at this point, get your data collectors, and hook up the first one to the Tyler terminal. Once you have it hooked up, push the power button, turning the unit on.
- Hit #1, Upload/Download
- Then  # 1 Download Data
- Now you will be asked to start the physical inventory download, hit Y (Yes) on the data collector and then on the Tyler terminal hit the TAB key on the keyboard.
- **After a few minutes, you should see records being recorded across the screens, both the terminal and the data collector. This process usually takes 20 minutes to download to the collector and then another 20 minutes to build an index file. The entire process for one collector is less than an hour. While the index file is building you can download another collector, so on the screen you will see a prompt for another collector.   At this point, if you have another data collector to download, answer Y (yes) and go through the same steps as above. If you have, no other collectors to download enter an N and TAB.   Please be sure that you keep your collectors plugged in to keep the batteries fully charged.**
- When the data collectors are done, we recommend that you check to see the download is complete on the Telxon collectors. From the main menu choose selection # 3 (Control Information), there you should see your store number, the serial number of the collector, the date of the inventory (actually this will always be the next day's date which is correct), and the status of the collector which should be a zero.
- **If you have trouble with your data collectors during normal business hours (usually 8:30am to 5:00PM M-F) contact your local MIS personnel. After normal business hours call 1-800-SKYTRY3 leave a message and someone will return your call.**

## Doing the Physical Count

There are many ways to do a physical count of inventory; _**this is the Tweeter way**_:

- ❏ First thing to do is map your store so you know where you will start and where you will end.
- ❏ Do the demos on the floor first, center area of the floor second, and stock room last.
- ❏ To start counting turn on the gun, hit the number two for inventory count entry and number two for open boxed goods.
- ❏ Pick the room you will start with and count left of the door going around the room clockwise. All the while checking for in-wall or in-ceiling components **(MAKE SURE NOT TO COUNT ANY ASSETS)**. Remember to put an **INVENTORY STICKER** on every item.
- ❏ After you finish the rooms start on the main floor. Again, pick a starting point and move around the room in a clockwise direction. **DO NOT COUNT CLOSED BOXED GOODS ON THE FLOOR AT THIS TIME, IE: MONSTER CABLE OR ANY BULK STACKS.**
- ❏ **Be careful on double tagged items that you scan the correct tag.**
- ❏ If you start inventory before the close of business Sunday it can only be demo items and it is imperative you use stickers. Should an item sell after it is counted the sales person that sold the item must inform the OPSM or GSM so the count can be adjusted. Use a log at the front counter so an adjustment can be made to the count.
- ❏ Change the gun from open to boxed count.
- ❏ After the floor, count any items that might be in the install bay. IE: kits or harnesses or anything else that might still be in the bay.
- ❏ At close of business stores that have multiple guns should count all closed or sealed box merchandise on the floor and in the stock room.
- ❏ On the floor pick a starting point and work your way around the room going left to right and making sure everything gets a sticker.
- ❏ In the stock room count the perimeter, going shelf to shelf, left to right tagging as you go. If you come across a bar code that doesn't scan write it down and go back at it later. When you come across items with three digits write them down as they won't scan correctly and can cause a miss count to the previously counted item.
- ❏ Now count the center of the stock room until everything is counted.

## UPLOADING INVENTORY FROM THE DATA COLLECTORS

- ❏ Once you have inventoried your entire LOCATION, it is time to upload your data collectors.
- ❏ FROM ENTER PASSWORD -- Type "02MGR" or "SALES" and enter # 27
- ❏ Choose selection #2 – UPLOAD DATA COLLECTOR
- ❏ The screen will show five lines of information. You will want to stop at this point and go to the data collector.
- ❏ Connect the collector to the Tyler terminal.
- ❏ Once you have hooked it up, push the power button, turning the unit on.
- ❏ Hit #1 Upload/Download
- ❏ Then hit #2 Upload Data
- ❏ Now you enter Y (yes) on the data collector and tab on the Tyler terminal, this will start the upload process.
- ❏ You should now see RECORDS, BLOCKS, ERRORS message across your screen and once you see a number going into the BLOCKS, you know things are running okay. **(Remember that a block represents a group of numbers, not just one record. It may take a little longer for you to see something appear on the Tyler Terminal then you did during the download process, however the upload process usually only takes about 15 minutes.)**

- ❑ Now all you have to do is wait until it says upload complete and asks you if you have another data collector to upload. If you do, start the same procedure over again, if you do not, your finished with the upload

## Running the Instant Deviation Report

- ❑ To run the Instant Deviation report...enter the following:

    a. At the "TMIS Password" prompt type "02MGR" or "SALES" select option # 27
    b. When the menu appears, select Option #10 "Instant Deviation Report".
    c. Run the report to your store spool to make it available to everyone.
    d. When the report is on the spool, print it to your plain paper printer.

## Using the Instant Deviation Report

- ❑ Scan the report for outstanding problems, which can be corrected immediately.
- ❑ Review the report in several phases starting with the items having the highest dollar value deviation (plus or minus.)

    | 1st Review | All deviations greater than $500 |
    | 2nd Review | All deviations greater than $300 |
    | 3rd Review | All deviations line by line, leaving nothing untouched |

- ❑ The report may be run after entering a significant number of recounts. Do not rerun the report too frequently. Reconciliation is complete ONLY when all items have been reviewed for accuracy.
- ❑ Be sure that all possible locations have been searched (display, wall-installed, service shelf, etc.)
- ❑ Use any and all reports for thorough recounts; ***nothing is too small or insignificant***. Go over every line and check every SKU until you are finished.

## ENTERING THE PHYSICAL COUNT CORRECTIONS INTO TYLER

- ❑ Log onto Tyler using the "02MGR" or SALES password.
- ❑ Select # 27, physical inventory.
- ❑ Select # 3, enter physical count.
- ❑ Enter your Branch #
- ❑ Enter book code 1
- ❑ Tab through section # and team # (DO NOT enter anything in these fields)
- ❑ Enter N to Add or Subtract
- ❑ Enter Y to Floor Models
- ❑ Enter R for Random
- ❑ Enter the Item # that needs to be changed.
- ❑ Clear the quantity that prompts and enter the correct quantity.

**If you have problems with the Telxon Data Collector, please read the attached PDF file for assistance before contacting MIS at 1-800-sky-try3.**

# On Order and In Transit Inventory Procedures

Inventory to be included in the inventory taking includes any merchandise that is on order or in transit to any Tweeter store, distribution center or other location to which title has passed to Tweeter as of the Closing Date, including but not limited to merchandise for which Tweeter has paid cash in advance.

In order to account for inventory that is on order or in transit, the ISC will obtain and review information and documentation from Tweeter that shows that Tweeter has paid for the Inventory and such Inventory is not in a distribution center or store as of the Closing Date. In that regard the ISC will consider the following, which is Tweeters present practice.

1. Tweeter confirms with the vendor which items are available for shipment in the regular course of business, usually 7-10 days.
2. Tweeter writes a purchase order ("PO") in the Tyler Retail System indicating that these items will be purchased with a prepayment. Each line item on the PO is entered and is noted in the field "ACK_NUMBER" (acknowledgement number) as CIAP (cash in advance prepaid).
3. The same date Tweeter writes the PO it either wires the money or overnights a check to the vendor.
4. In certain instances Tweeter has earned a credit with a particular vendor and the vendor will ship product against this credit. Tweeter records all such orders as CIAP.
5. Tweeter receives notification from each vendor when an item is shipped. When this notification is received the ACK_NUMBER field is changed to CIAS (cash in advance shipped).
6. When an item is received at the warehouse it is processed through the Tyler Retail System. The receiving causes the item to be removed from the CIAS status and the cost is recorded as inventory in the warehouse.
7. Daily Tweeter produces a report of CIAP and CIAS items. This report is reviewed by Company personnel as well as the representative from GE.
8. In order to insure a good cutoff on the Closing Date, Tweeter will run a report detailing all CIAP and CIAS items. This report will include PO number, number of items ordered per SKU, inventory cost, vendor and other detail information. Tweeter will collect all the shipping notifications from the vendors. When the goods are received it will collect all the shipping documents and cross reference them to the report.
9. This report can then be used to roll inventory forward to the date of any inventory count.

## SCHEDULE 5.1

** Certain entities are not in good standing due to outstanding annual reports and/or taxes owed.

### Tweeter Home Entertainment Group, Inc.
Jurisdiction of Organization: Delaware
Qualified to do business in:
Massachusetts

### Hillcrest High Fidelity, Inc.
Jurisdiction of Organization: Texas
Qualified to do business in:
None

### New England Audio Co., Inc.
Jurisdiction of Organization: Massachusetts
Qualified to do business in:
Alabama
California
Connecticut
Delaware
Georgia
Illinois
Maine
Maryland
New Jersey
New York
North Carolina
Pennsylvania
South Carolina
Tennessee
Texas
Virginia
Nevada

### NEA Delaware, Inc.
Jurisdiction of Organization: Delaware
Qualified to do business in:
New Hampshire

**Sound Advice, Inc.**
Jurisdiction of Organization:   Florida
Qualified to do business in:
None

**Sound Advice of Arizona Inc.**
Jurisdiction of Organization:   Florida
Qualified to do business in:
Arizona – operates under forced dba SA Home
Entertainment Inc.

**Sumarc Electronics Incorporated**
Jurisdiction of Organization:   North Carolina
Qualified to do business in:
None

**THEG USA, L.P.**
Jurisdiction of Organization:  Delaware
Qualified to do business in:
Massachusetts
Texas

## **SCHEDULE 5.3(b)**

### Consents

Cross reference is made to Schedule 5.11(b)(iii) which is incorporated herein by reference.

## DRAFT SCHEDULE 5.5(a)

Tax Liens

None